**FILED**

AUG 1 0 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
FOR AND ON BEHALF OF THE
GOVERNMENT OF THE
FEDERATIVE REPUBLIC OF BRAZIL    )
)
)
)
)

        Applicant,    )
)

        v.    )
)

ALL FUNDS ON DEPOSIT IN ACCOUNT NO. )
75886-0116 (000075886) AT BANCO DO )
BRASIL - NEW YORK - IN THE NAME OF )
YALE INTERNATIONAL TRADING LLC;    )
)

ALL FUNDS ON DEPOSIT IN TIME DEPOSIT )
ACCOUNT NO. 022292864 AT BANCO DO )
BRASIL - NEW YORK OR MIAMI - IN THE )
NAME OF YALE INTERNATIONAL )
TRADING LLC;    )
)

        Respondants.    )
)

Case: 1:07-mc-00318
Assigned To : Urbina, Ricardo M.
Assign. Date : 8/10/2007
Description: MISCELLANEOUS

## EX-PARTE APPLICATION FOR RESTRAINING ORDER
## PURSUANT TO 28 U.S.C. § 2467(d)(3)(B)
### *TIME SENSITIVE*
### *TIME DEPOSIT ACCOUNT MATURES MONDAY, AUGUST 13, 2007*

The United States of America, by and through its undersigned attorneys, respectfully

requests that this Court issue a restraining order, pursuant to 28 U.S.C. § 2467(d)(3), to enforce

foreign orders issued by the District Court of Rio Grande do Sul (the "Brazilian Court") in the

Federative Republic of Brazil, to freeze and restrain, *inter alia,* two bank accounts associated

with YALE INTERNATIONAL TRADING LLC, a Delaware limited liability company, whose

principals are charged in Brazil with money laundering, operation of unlicensed money

remittance services, and a variety of predicate crimes in violation of Brazilian law.  The



1

Brazilian Court orders were transmitted to the United States pursuant to an official request under

the Mutual Legal Assistance Treaty ("MLAT") between the United States and Brazil. Article 16

of the MLAT provides for assistance in forfeiture matters, including the freezing and restraint of

assets which are subject to forfeiture in the requesting state.[1]  Copies of the Brazilian Court

Restraining Orders dated February 9, 21 and March 1, 2007, are attached hereto as Exhibits A,

B, and C.[2]

In compliance with the statute, U.S. Department of Justice Assistant Attorney General

Alice Fisher has certified the Brazilian Court's orders for enforcement pursuant to 28 U.S.C.

§ 2467(d)(3)(B)(ii).  A facsimile of this Certification is attached as Exhibit D.  Thus, the United

States respectfully requests that this Court issue an Order restraining the two accounts at Banco

do Brasil named in the caption, which Order shall remain in place until criminal proceedings and

forfeiture proceedings in Brazil are concluded.

## I.     FACTUAL BACKGROUND

This request arises from a Brazilian investigation, known as "Cabo Verde," into money

laundering operations of at least sixty (60) individual and corporate entities involved in extensive

money transmitter activities between Brazil and a number of U.S. banks.  The February 9, 2007,

order (Ex. A) details some of the evidence against each of the targets, and documents

---

1 *See* Treaty with Brazil on Mutual Legal Assistance in Criminal Matters, Oct. 14, 1997, U.S.-
Braz., S. Treaty Doc. No. 105-42, Art. 16.

2 The February 9th Order of the Brazilian Court summarizes the case and lifts Brazilian bank
secrecy provisions with regard to accounts of the named targets. The February 21st Order
authorizes a sharing of information with foreign authorities and orders the restraint of US
accounts at Israel Discount Bank and Sun Trust Bank (all of which were later determined to have
been closed).  The March 1st Order restrained any accounts held by the targets at Banco do Brasil
in the United States.

evidence obtained by court-ordered wiretaps in Brazil and other sources.  Investigators intercepted facsimile transmissions revealing that the targets conducted a sophisticated "modified hawala" operation through which millions of dollars in criminal proceeds were laundered outside the official Brazilian financial system - including the organization's own assets and assets from third parties involved in crimes of embezzlement schemes, drug trafficking and smuggling operations.  Of note are funds which were laundered for members of the Juarez, Mexico, drug cartel, and drug cartels in Colombia.  These financial operations were conducted without the currency moving entities being registered as regulated money transmitters in either Brazil or the United States, in violation of felony provisions in both countries.

As the Federal Criminal Court in Brazil has found (Ex. A, B, and C), Jose Alexandre Guillardi Freitas, as the director of Portocred (which is a financial entity licensed by the Central Bank of Brazil - BACEN) moved assets from his licensed company to several companies established by co-conspirators Fabiano Goens, Alexandre Freitas, and others, which were not licensed as financial companies in Brazil.  These companies were made to appear as import/export companies or tourism companies, to create the appearance of having legitimate reasons to export currency from Brazil.  A number of offshore "shell" corporations were established by the Cabo Verde organization in order to create the appearance of these organizations legitimately receiving the exported currency.  Among these was the YALE TRADING CORPORATION, LLC ("YALE TRADING"), registered in Delaware, and having an account at Banco do Brasil in New York, New York.  According to YALE TRADING's website, it conducts commercial trade representation for importers and exporters worldwide, financial and market analysis, international and domestic collection, and financing.  Its listed shareholders include:  (1) Antonio Carlos de Oliveira Haussen, (2) Jose Alexandre Guilardi de

3

Freitas, and (3) Joao Batista Urrutia Jung, all three of whom are charged defendants in Brasil. (*See* Ex. A, p. 21) These three have been arrested in Brazil, and currently the Brazilian court is taking evidence in the criminal case against them.

At least five different fictitious Brazilian companies were established to move currency: Cobrasel - Cobrancas E Servicos Ltda; LL Promotora De Vendas E Servicos Ltda; Apoio - Consultoria E Cobranca Ltda; Promocred Promotora de Vendas E Servicos; and Centralfac - Assessoria E Fomento Comercial Ltda. None of these entities were registered with BACEN. These companies collected funds from third parties, who "structured" the transmissions for export. Faxes were used to make these transactions appear legitimate. In addition, an offshore company in Uruguay (Dawes International) was used to create legitimacy to the "hawala" system of collection for apparent trade-based transactions.

As to the drug nexus for some laundered funds, Brazilian investigators intercepted telephone conversations between Joao Quirino Medeiros Goncalves and an unidentified person discussing financial transactions of Ernesto Plascencia San Vicente (arrested in July 2006), the lieutenant of Amado Carrillo Fuentes (known Mexican drug traffickers of the Juarez cartel). In addition, numerous intercepted calls and faxes confirmed that Rogerio Luis Goncalves was a partner of Ernesto Plascencia San Vicente in an automobile business located in the Brazilian State of Santa Catarina.

The Orders of the Brazilian Court (Ex, A, B, and C), transmitted pursuant to the Mutual Legal Assistance Treaty with Brazil, restrained a number of accounts in the United States, including, *inter alia,* any accounts at Banco do Brasil, New York, New York. Currently, only two accounts remain open to which restraint has been ordered by the Brazilian Federal Criminal Court. Both are at the Banco do Brasil in New York: (1) Account No. 22292864 with a balance

4

of $520,039.11 as of June 11, 2007; and (2) Account No. 758860116 with a balance of only

$616.76 on the same date, Account No. 22292864 is a Time Deposit account which was opened

on February 12, 2007, with a deposit of $512,000. *This account matures on Monday, August*

*13, 2007, with written instructions to Banco do Brasil that the funds are to be deposited to*

*Account No. 758860116 (which appears to be a working business account with*

*the recent balance of only $616. 76).*[3]

## II.    RESTRAINT IN THE U.S. IS AUTHORIZED BY 28 U.S.C. § 2467(d)

The assistance sought by Brazil is permissible under U.S. law.  Specifically, 28 U.S.C.

§ 2467(d)(3), enacted in the USA PATRIOT Act of 2001, provides:

> **(A) In general.-** To preserve the availability of property subject to a foreign forfeiture or confiscation judgment, the Government may apply for, and the court may issue, a restraining order pursuant to section 983(j) of title 18, United States Code, at any time before or after an application is filed pursuant to subsection (c)(1) of this section.

> **(B) Evidence.-** The Court, in issuing a restraining order under subparagraph (A) – . . .

> (ii) may register and enforce a restraining order that has been issued by a court of competent jurisdiction in the foreign country and certified by the Attorney General pursuant to subsection (b)(2).

The Attorney General's certification is nonreviewable:

> The Attorney General or the designee of the Attorney General shall determine whether, in the interest of justice, to certify the request, and such decision shall be final and not subject to either judicial review or review under subchapter II of chapter 5, or chapter 7, of title 5 (commonly known as the "Administrative Procedure Act"). 28 U.S.C. § 2467(b)(2).

---

3  The Time Deposit account has a 4.75% fixed interest rate and 4.8% yield, and is expected to grow to $524,295.11 by its maturity date of August 13, 2007.

The statute provides for the registration and enforcement of foreign restraining orders by United States district courts whenever there is a valid treaty or other formal agreement covering mutual assistance between the United States and the requesting Government on forfeiture matters. The MLAT between the United States and Brazil satisfies this element. In addition, the property sought to be restrained must be the proceeds of, or property involved in or traceable to, any offense described in Article 3, Paragraph 1, of the United Nations Convention Against Illicit Traffic in Narcotics Drugs and Psychotropic Substances, or any violation of foreign law which would also constitute an offense under the laws of the United States if committed in the United States. *See* 28 U.S.C. § 2467(a).

The findings by the Brazilian Court indicate that the funds contained in the two Banco do Brasil accounts of Yale International Ltd. comprise property involved in, and likely traceable to, the offenses of operating money remitting businesses without the required registration with the Central Bank of Brazil, and of processing non-authorized transfers of funds outside of Brasil. This activity constitutes violations of Brazilian law, specifically, Article 16 and 22 of Law No. 7.492/86. (*See* Ex. B, p. 1). The evidence also indicates that some of the laundered funds may have derived from assets of members of Mexican and Colombian drug cartels, which constitute additional violations of Brazilian law, specifically, Article 1 of Law No. 9.613/98. *Id.* Upon conviction, the Brazilian Court may issue a final confiscation order equal to the value of the property obtained as a result of or in connection with the charged criminal offenses, pursuant to Article 91, II of the Brazilian Criminal Code, and Article 7 of the Law 9613, of 1998 (Brazilian Money Laundering Statute). As in the United States, its purpose is to recover assets obtained from the criminal offenses.

6

Brazilian law provides that the owner or partner of a legal entity must receive the notice for forfeiture of corporate assets rather than the legal entity itself, and that the forfeiture is accomplished in the criminal case against the owner or partner of the legal entity. Thus, to ensure that the statutory requirement of proper notice in the foreign country, *see* 18 U.S.C. § 2467(b)(1)(C), is given, the Brazilian authorities have certified as part their request that notice will be provided directly to all legal entities implicated in this request to afford them a timely and fair opportunity to challenge the action.

Thus, ample justification existed for the certification provided by the Assistant Attorney General of the attached foreign restraining orders for enforcement in the United States. Brazilian authorities have charged the targets with conduct that, assuming that the conduct had occurred in the United States, would subject the funds to forfeiture as the proceeds of and property involved in violations of US. law, specifically 18 U.S.C. § 1960, operating unlicensed money remitters. The funds are also alleged to be the proceeds of, or involved in, money laundering and drug trafficking, which would constitute violations of U.S. law, specifically, 18 U.S.C. § 1957, making the funds subject to forfeiture under 18 U.S.C. §§ 981 and 982. Finally, the Assistant Attorney General has certified that enforcement of the attached Brazilian Court restraining orders is in the interest of justice, as it is consistent with the United States' national interest in avoiding use of U.S. financial institutions as a safe haven for the laundering of criminal proceeds from abroad.

## III.    CONCLUSION

Therefore, the United States respectfully requests that this Court enforce the requested Restraining Orders of the Federative Republic of Brazil, consistent with U.S. treaty obligations

7

under the MLAT between the Governments of the United States and the Federative Republic of Brazil, by entering the attached restraining order against the captioned funds pursuant to this Court's authority under 28 U.S.C. § 2467(d)(3)(B)(ii). The United States further asks that it be permitted to serve the Order by facsimile transmission to the affected financial institution, Banco do Brasil. The United States further states that it will promptly request, through the appropriate legal assistance channels, that those individuals and entities with an apparent interest in the captioned funds be provided with notice of, and a copy of, this Court's Order. Additionally, the United States will seek to amend this order as additional assets become known to it.

Respectfully submitted,

RICHARD WEBER, CHIEF
ASSET FORFEITURE AND
MONEY LAUNDERING SECTION

BY: _Linda M. Samuel_
LINDA M. SAMUEL   (DC. BAR #388970)
Deputy Chief

Dated : 8/9/07

_Jean B. Weld_
JEAN B. WELD (VA. BAR #19295)
Asset Forfeiture and Money Laundering Section
U.S. Department of Justice
Criminal Division
1400 New York Avenue, N.W.,
Washington, D.C. 20530
Telephone:     (202) 514-1263
Fax:               (202) 514-5522

Attorneys for Applicant
UNITED STATES OF AMERICA

Judicial Branch
FEDERAL JUSTICE
District Court of Rio Grande do Sul
1st Federal Criminal Court and Federal Special Court of Porto Alegre

REQUEST FOR SAFEGUARDING MEASURES No. 2007.71.00.001991-3/RS
REQUESTING AUTHORITY: PUBLIC JUSTICE

DECISION

It refers to a representation prepared by the police authority for the lifting of the fiscal and bank secrecy of the investigated suspects in the OPERATION CABO VERDE, initiated in order to uncover the criminal organization dedicated to the practice of crimes against the national financial system and of money laundering.

The Public Prosecution Agency is favorable to the request (pages 5/10).

**Here is the report.**

The fundamental right to intimacy (Federal Constitution, article 5, X) is not an absolute right, meaning that some of its manifestations be restricted with and end of allowing the State to examine offensive conducts to relevant assets of the community, according with the judgment of proportionality. The restrictive measure shall be proportionate if it is <u>adequate</u>, <u>necessary</u> and <u>proportional</u> "stricto sensu".

The lifting of **financial secrecy**, which comprehends banking secrecy, constitutes adequate measure to analyze the real financial transactions of the investigated suspects, due to the evidence obtained in the Police Investigation No. 872/2003 and the volume of information obtained in the course of the telephone wiretapping authorized by this court, which indicates the functioning of a financial institution and exchange house without the any legal authorization of the Central Bank of Brazil, by which the existence of investing accounts in foreign currency can be found, and the acting in the parallel exchange market, especially by means of modified hawala system operations.

The following wiretap demonstrates, in detail, a transaction with the modified hawala system:

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5184081051 | TOUR EXPORT V. E TURISMO LTDA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@HNI X FABIANO | | |
| DATE/INICIAL TIME | DATE/FINAL TIME | DURATION |
| 20/11/2006 11:32:08 | 20/11/2006 11:33:34 | 00:01:26 |
| ... | | |
| DIALOGUE | | |

FILED

07H5 318

AUG 10 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

HNI asks how it is. FABIANO says 21 to 31, on the counter, and that the "hawala" does it 21, 27, and that the "currency" 23, 29. HNI asks if around 10 is 27 – US$ 10,000.00 at 2,27 the conversion rate dollar/real. HNI asks the parity. FABIANO says it is 30, 50, one point thirty. HNI asks if it is to hand him paper. FABIANO asks if it is EURO. HNI says it is another – dollar. FABIANO asks what he wants. HNI says that it is to send – send it out of the country. FABIANO says that in that amount he would calculate 1% plus US$ 60.00 for expenditures. HNI asks if all the rest has 60. FABIANO confirms.

----------------------------------------------------

COMMENT: 1% of US$ 10,000.00 = US$ 100.00 + US$ 60.00 fee = US$160.00
Conversion from: US Dollars (220) – amount to convert: 160 to Brazilian Real (790)
Result of the conversion: 345,36 – date considered for the conversion 17/11/2006
Rate: 2,1585 REAL/BRAZIL = 1 US DOLLARS. In other words, in order to remit US$ 10,000.00, if given in dollars, cash, without converting the currency, it is charged R$ 345,36.

In this regard, it is fundamental to discover the financial transactions of the investigated suspects, in order to obtain the total sum involved and in which banks and agencies were registered. The necessity of such measure comes from the inexistence of any other capable way of demonstrating, with the same amount of sureness, the authors and materiality of the crimes under investigation. The proportionality "stricto sensu" becomes evident by the just cause for the requisition, set forth below, in relation to the involved with the criminal organization.

**ANTONIO CARLOS DE OLIVEIRA HAUSSEN** (CPF 203.012.270-04), according to data obtained from the wiretaps judicially authorized, would be the head of the organization, and would act as the main articulator of the illegal scheme and the possible de fact owner of the PORTOCRED and PORTOTRADING companies. He would possess authority over the remainder of the components of the criminal organization, especially over **JOSE ALEXANDRE GUILLARDI FREITAS** (CPF 053.276.520-68) and **JOAO BATISTA URRUTIA JUNG** (CPF 427.247.080-91), both head of the companies that would sustain the businesses made by TOUR EXPORT TURISMO LTDA, and would integrate a second level of the criminal organization, guaranteeing the operations made in name of said company and introducing money to the company, possibly coming from PORTOCRED and PORTOTRADING, and probably with no origin, coming from a parallel accountability which was not declared to the Brazilian Internal revenue service, also known as "caixa 2". According to the investigation, specific businesses and payments would only be made once authorized by HAUSSEN, fact which also characterizes his command over the rest.

The following intercepted dialogues demonstrate the conversations between them and the systematic subordination of JUNG and ALEXANDRE to HAUSSEN, especially because ALEXANDRE's actions are confirmed by HAUSSEN, and the other way round is not seen, demonstrating the dependence and satisfaction owed by him to HAUSSEN.

| TELEPHONE | NAME TARGETED |
|-----------|---------------|
| 5181239013 | HAUSSEN-NUFIN |

SPEAKERS/COMMENTS
HAUSSEN X JUNG@@@

| DATE/INICIAL TIME | DATE/FINAL TIME | DURATION |
|---|---|---|
| 28/12/2006 10:44:21 | 28/12/2006 10:46:19 | 00:01:58 |

...

DIALOGUE

H – says that there is a person from FININVEST, and says that he is waiting there; J – says that they want to know what TRADING is and says that he has to go there; he is not a worker, and says that he can't deliver all the gold, and is trying to start a partnership, and perhaps something can be done together. Says that he was going out with the car and locked and says that his father wants to speak to him.

| TELEPHONE | NAME TARGETED |
|---|---|
| 5181239013 | HAUSSEN-NUFIN |

SPEAKERS/COMMENTS
HAUSSEN X ALEXANDRE@@@

| DATE/INICIAL TIME | DATE/FINAL TIME | DURATION |
|---|---|---|
| 08/01/2007 21:37:51 | 08/01/2007 21:41:40 | 00:03:49 |

...

DIALOGUE

A – says that he and JOAO went for a walk, and says that they are going to meet JUAN and LEANDRO. Says that it is being a good year and he tells the man to relax. And asks when they are going to give the money back. H – talks about his money, and talks about the 500 thousand. A – You are calculating including the applications. H – and he is going to have all he has on TRADING. A – says that he is running the show.

In the report of the police investigation No. 629/01, ANTONIO CARLOS HAUSSEN is connected to large quantities of assets, in a spreadsheet found in one of the computers analyzed by the forensic team, which were directly linked to LUIS CARLOS FAGUNDES JR. and PORTOCRED. HAUSSEN continues with the applications with the companies used by the group.

Several interceptions demonstrate that the involvement of ANTONIO CARLOS HAUSSEN with the organization, among which we name one between ALEXANDRE and JR. talking about HAUSSEN, in which they state that ADRIANA, partner of TOUR EXPORT, is nobody, and that the person who would give the guarantees to the business would be HAUSSEN (5581127179, 30/11/2006, 10:30:24, 00:02:58 – ALEXANDRE and JR). The investigation obtained elements that JR is the main link between FABIANO's office with HAUSSEN. He is the person who delivers the money to ANDRE (employee of HESSEY), who would then give it to HAUSSEN. The abovementioned dialogues, as well as the other intercepted calls, are not transcribed below because it is a very long list, but can be consulted in the police intelligence report.

JOSE ALEXANDRE lives with PATRICIA IZE KLEIN, former employee of PORTOCRED, and nowadays is the director of this company.

Several intercepted calls demonstrate the involvement of JOSE ALEXANDRE with the organization, mainly referring to the financial applications administered by FABIANO and JOAO QUIRINO, and to the parallel activities that ALEXANDRE, JUNG and HAUSSEN

articulate. They are not presently transcribed, as it is a very long list, but it can be consulted in the police intelligence report.

JOAO BATISTA URRUTIA JUNG, investigated in the police investigation No. 272/2003, investigation related to the parallel financial transactions of PORTOCRED and other companies, is indicated in police investigation No. 629/01 as administrator of the law firm, which nowadays is named EDUARDO DORFMANN ARANOVICH, GERSON BRANCO & ADVOGADOS, stating in his defense that he is not part of PORTOCRED since 2002, law firm in which ANTONIO CARLOS HAUSSEN and ALEXANDRE are clients.

JUNG is the closest to JUAN (employee of the Uruguayan group) and several tapped dialogues would demonstrate the relationship of himself and the group with HAUSSEN. It is stated in the Police Intelligence Report that JUNG would be as much involved in the organization as ALEXANDRE, even though his attitudes were more discreet and he formally tried to remain unattached to the group.

Innumerous dialogues which demonstrate the involvement of JOAO BATISTA URRUTIA JUNG with the organization can be checked in the Police Intelligence Report.

**FABIANO GOENS (CPF 737.730.930-04), JOAO QUIRINO MEDEIROS GONÇALVES (CPF 108.404.600-82), CASSIO ANTONIO URRUTIA JUNG (CPF 414.944.310-68) and CARLOS LEANDRO DA SILVA (CPF 586.145.160-53)** were part of the third level of the organizations, the first three acting in the companies that would directly execute the illicit activities and that until the present moment were identified as TOUR EXPORT VIAGENS E TURISMO LTDA., JARAU PRESTADORA DE SERVIÇOS LTDA. E CONSULTORIA ROPE ESCRITÓRIO DE ASSESSORIA LTDA., and the last person acting in the city of Montevideo, Uruguay, executing and giving support to the operations made by the organization abroad.

The dialogue below demonstrates the connection between all the persons above. In the same intercepted phone call, it is arranged the trip of JUNG, ALEXANDRE, FABIANO and QUIRINO to Montevideo, Uruguay.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181197320 | JOAO URRUTIA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| ALEXANDRE X JUNG@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 05/01/2007 12:44:36 | 05/01/2007 12:48:05 | 00:03:29 |

...

DIALOGUE
A – says he is OK, that he rested and that he is not working anymore and that he [ALEXANDRE] will be sending him [JUNG]; HAUSSEN sends money to him and it will arrive in Uruguay at the same time and then they meet in the Airport. They talk about politics and that the State Government is dead. Asks if he went to Punta? And asks what was the profit margin? The phone call disconnected.

FABIANO GOENS, together with ADRIANA REGINA S. DE SOUZA, would together be partners of TOUR EXPORT VIAGENS E TURISMO LTDA. and directly responsible, together with LEANDRO, in the modified hawala system operations.

It was shown in the investigation that FABIANO GOENS' identity was utilized for illicit activities, such as PORTOCRED's parallel accounting.

Coordinated by ALEXANDRE, he [FABIANO GOENS] is considered in the investigation as the prime articulator of the modified hawala system, and possible crimes of capital flight and money laundering.'

Innumerous intercepted audios demonstrate the involvement of FABIANO GOENS with the organization, but they are not transcribed as they can be found in the Police Intelligence Report.

JOAO QUIRINO is partner of ROPE and the prime responsible for the financial transactions, administering clients and participating in the administration of the financial system of the investigated group.

He appears in the investigations as one of the main controllers of the system where the client information in kept, him being of key importance for the controlling of employees, clients and assets applied and transferred abroad.

QUIRINO would be the link between JOAO JUNG and FABIANO, knowing of the transactions that were happening.

Innumerous intercepted audios demonstrate the involvement of JOAO QUIRINO with the organization, but they are not transcribed as they can be found in the Police Intelligence Report.

CASSIO ANTONIO is the brother of JOAO JUNG and responsible for administering the office of TOUR EXPORT, JARAU and ROPE, and for the structure utilized by the investigated group. He knows of all the activities done via the modified hawala system. CASSIO administers the functional structure of the group, controlling the payment of employees and others, as well as also carrying money for the group, in bags, suitcases and "perneiras" – devices used to hide money in the body during the its transport from one place to another. According to intercepted telephone conversations, they can transport at least R$ 80,000.00 in these devices –, bank withdrawals and safe deposits. He rented and has access to a bank safe, where the group usually deposits large quantities of cash, which stay there when they are waiting for a destination.

In the dialogue intercepted on the telephone 5191493897, in 05/01/2007, at 11:04:07, for example, is illustrated what was described above, about a large quantity of money that CASSIO would be transporting from the bank to another destination. CASSIO says he is in BANCO SANTANDER with a money transporting bag, and it is 200 thousand in 100 bills, and in the second dialogue says he is in ITAU and comments about transporting 80

thousand that they are carrying in "perneiras", but that he will not be able to leave because the bank will make the remainder of the money available.

Other audios which indicate the involvement of CASSIO can be found in the Police Intelligence Report.

CARLOS LEANDRO would be responsible for the base localized in Montevideo, Uruguay of the CABO VERDE NETWORK. He would directly receive the payment instructions with the name of the beneficiary, name of the bank, SWIFT – digital certification company for the remittance between banks – based in Belgium and with a branch in the United States (the receipt of the remittance is also called SWIFT – and other details to where the money shall go to).

The intercepted audios between CARLOS LEANDRO DA SILVA and others speakers, considered important to the investigation, especially the connection between LEANDRO and ROSE, which demonstrates the transaction made by them, can be found in the Police Intelligence Report.

**JUAN CARLOS CHIFFLET DELGADO** (Uruguayan), also integrates the third level, would give, according to the police authority, international logistics support to the criminal organization, possibly as the legal representative of DAWES INTERNATIONAL SA, located in Montevideo, Uruguay and where Carlos Leandro da Silva works.

According to the Police Intelligence Report, the telephone number given by JOAO QUIRINO to ROSE, so she could speak to LEANDRO, in Uruguay, besides being given in other occasions to other people, including to send faxes (598 29020638) is registered in the name of DAWES INTERNATIONAL SA.

The intercepted audios between JUAN CHIFFLET DELGADO and other persons, one of which JUAN, states that HAUSSEN had already sent him the money, which strengthens the link between these threes persons, are transcribe below.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181346666 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@JOAO QUIRINO X JUAN | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 26/12/2006 12:57:17 | 26/12/2006 13:00:29 | 00:03:12 |

...

SUMMARY
Exchange of information about the computer system that JOAO QUIRINO needs to access to make financial transactions and that it is temporarily not operating
DIALOGUE
JOAO says that he was talking to LEANDRO about the system, and that he would like to ask him a special attention, otherwise he will makes things hard for him, and that if it is needed he will catch a taxi and go straight to ANATEL, because he has a serious problem, because he has to close some operations. JUAN says he cannot call right now, but it has

been 45 minutes, and that he is on the street and calculates that there is some general problem and not a particular problem, but that if he cannot deal with it via phone, he will go personally. JOAO asks if they only open at 2 p.m. JUAN tells him that he is waiting for the person that has the office keys and that he cannot leave now and that he thinks that by 2 p.m. he is back and handling the problem. JOAO says that LEANDRO told him that the "suite" is good and that he has all the lights on. JUAN confirms. JOAO asks if the accesses the internet via ANSEL or another internet provider. JUAN says he accesses the internet by it, and that he had no problem all morning. JOAO then says that the problem is not general. JUAN says that it may be another band, and that he will call to see if they will give him attention and that if they do no pick up he will go there personally

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181197320 | JOAO URRUTIA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| JOAO X JUAN@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 19/12/2006 17:35:15 | 19/12/2006 17:37:18 | 00:02:03 |

DIALOGUE

JU – says that he needs the AUDREI's power of attorney, and says that the copy can be sent via e-mail and asks to send it first thing tomorrow

**ANA PAULA IZE KLEIN** (CPF 805.471.411-49), also know as PITI, **ADRIANA REGINA SCHUNCK DE SOUZA** (CPF 635.435.080-1) and **CARLOS WAINBERG** (CPF 973.546.860-34), would work in a fourth level, according to the police authority, or as a "laranja" (person whose identity was illicitly utilized in order to hide the true owner of the assets) or as an employee for the companies that do the illicit operations.

ANA PAULA (PITI) is the sister of PATRICIA IZE KLEIN, wife of JOSE ALEXANDRE GUILLARDI FREITAS, and works as a manager for the group, coordinating the irregular remittance of money to or from abroad, as well as making payments and bank deposits. She is also the link between the operators of the parallel financial system and the transporters of money that do the field work for the irregular currency exchange in cash and/ or making the payments, having full knowledge of the illegality of her actions, since she personally coordinates the modified hawala system operations.

In the Police Intelligence report there is reference to the fact that ANA PAULA already worked in the same company, at the time of the police investigation No. 872/2003, whose responsible was LUIZ CARLOS FAGUNDES JUNIOR, demonstrating that her relationship with the members of the group are old.

The audios indicate the involvement of ANA PAULA IZE KLEIN can be found in he Police Intelligence Report.

ADRIANA is partner if the company TOUR EXPORT, but exercises no power over it, fact which characterizes her as a "laranja", because the investigation indicates that she is an employee of the organization that lent her name for the incorporation of the company, having, nevertheless, full conscience of the illegality of her actions, due to the many illicit

operations executed. She would work in the same physical space occupied by FABIANO, CARLOS WAINBERG and JOAO QUIRINO, answering calls from clients who wished to make modified hawala system operations, currency exchange, such as investments and withdrawals of investment accounts they had abroad with the organization. Moreover, she would command the pick up and delivery of money with clients, through ANA PAULA (PITI), and the employees responsible for the street jobs of the organization.

According to the investigation, ADRIANA would only be an employee of the group, without any interference over the salary paid to her husband; some money received in cash for the office of FABIANO, JOAO QUIRINO and ADRIANA are handed by FABIANO to HAUSSEN, also know as "H" or "BAIXINHO". The deliveries are usually made by JR, LUIS CARLOS FAGUNDES JUNIOR to an employee of HAUSSEN known as ANDRE, in the city of NOVO HAMBURGO. The following telephone calls demonstrate the connection between HAUSSEN with all the group responsible for the modified hawala system (QUIRINO, FABIANO, ADRIANA, JR), and that the destination of the money really is directly to HAUSSEN. HAUSSEN, as shown in the police investigation 872/03, has large amounts of money invested in the office of FABIANO, were the modified hawala system occurs, showing himself as the big financer of TOUR EXPORT, PORTOCRED and PORTOTRADING.

Innumerous intercepted audios demonstrate the envolvimento of ADRIANA with the organization, and can be consulted in the Police Intelligence Report.

CARLOS WAINBERG, also know as CACO, would act together with ADRIANA and FABIANO, answering calls from clients that wish to illegally remit abroad, performing currency exchange, as well investing and withdrawing from investment accounts maintained by the illegal financial insititution.

CACO, FABIANO, ADRIANA and JOAO QUIRINO used cellular telephones to answer calls made by of clients, even in their office, seeking, in this way, to maintain their activities hidden, making it difficult, in their vision, to investigative the group. Many a time, the clients with which they negotiate don't even know where the office physically is.

Several intercepted audios between CARLOS WAINBERG – CACO, and other speakers can be found in the Police Intelligence report.

**FABIANO RODRIGUES MAGALHAES** (CPF 669.618.660-34), **MARCIO VIEIRA TATSCH** (CPF 001.014.050-65), **ROBERTO SAMPAIO TRAJANO** (CPF 918.464.710-87), **RODRIGO KUHN DA SILVA** (CPF 935.767.060-20), **LUIZ CARLOS FAGUNDES JUNIOR** (CPF 519.913.570-87), **JEFFERSON PEREIRA DA SILVA** (CPF 673.666.940-53), also know as CAPU, **RICARDO JOSE SCHMID** (CPF 293.311.700-25) and **ALFREDO TIMM DE SOUZA** (CPF 708.470.290-34) would integrate a fifth level of the organization. The seven first are carriers of the money/ documents, executing field jobs, especially transporting money for the conduct the irregular currency exchange in cash and/ or the payments that make those operations possible. ALFREDO, former employee of the organization, would continue to provide technical assistance in the computer field, autonomously, receiving a salary for that, with full

conscience that the activities were illicit, being the key for its execution because, besides being the husband of ADRIANA, he developed the systems used by the illegal financial institution and the illegal exchange operations.

FABIANO would be a carrier of money/ documents, and also would do other services for the criminal organization.

The intercepted audios between FABIANO RODRIGUES MAGALHAES and other speakers, considered important to the investigation, demonstrate the functions of MAGALHAES within the criminal organization, and can be found on the Police Intelligence Report.

MARCIO VIEIRA would carry money and documents, as well as doing other services for the investigated group. He has several telephone lines used by the group in his name, such as 51.8182.0682, which is used as the work cellular phone of FABIANO GOENS. Likewise, the number 51.8427.7640, is used by ROSE and MARIA HELENA for illegal transfers, and work in UNIBANCO bank.

Below, an intercepted audio between ANA PAULA IZE KLEIN and JEFFERSON PEREIRA DA SILVA – CAPU, in which it becomes clear that she is coordinating him to help MARCIO to transport 300 – possibly R$ 300,000.00. CAPU says that he has nothing, making reference to the "perneiras", used for the transport of money, and another important for the investigation, demonstrating the importance of MARCIO and other carriers, all considered by the organization as trustworthy, being given to MARCIO the number of the vault of the company so that MARCIO could make banking negotiations.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181492079 | TOUR EXPORT V. E TURISMO LTDA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@PATY X CAPU | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 12/12/2006 17:11:51 | 12/12/2006 17:12:36 | 00:00:45 |

...
SUMMARY
FINANCIAL TRANSACTIONS – MONEY IN SUITCASE, CASH.
DIALOGUE
PITY asks is he is already buying or not, if he is already at the teller. CAPU says no. PITY says that she needed him to go to the vault, to do the same thing he did yesterday. CAPU says that he has nothing on him. PITY says that it is the same thing he did yesterday and that he will not need to carry anything, that it is for him to go up there, receive and wait, that MARCIO will go there with the suitcase and that he is to accompany him to the car and that's it, and that there should be 300 – 300,000.00 reais or dollars??? – and that if it is sealed it is to remain sealed and that it won't be necessary to count, just leave it sealed.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5193241783 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@JOAO QUIRINO X MARCIO (No OF VAULT) | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |

05/01/2007 14:09:41          05/01/2007 14:10:27          00:00:46

...

DIALOGUE

JQ instructed MARCIO to identify himself with vault No. 1572 in BANRISUL bank.

ROBERTO SAMPAIO would carry money, deliveries, payments and other money transactions and documents, as well as other services for the investigated group. According to the Police Intelligence report, dated December 2005, in Porto Alegre, ROBERTO already carried out transactions for the organization, since he was the victim of theft, where R$ 38.390,00 in cash was involved, the same he carried in a leather bag.

The intercepted audios between ROBERTO and other speakers can be found in the Police Intelligence report.

RODRIGO KUHN would work in ROPE, alongside ADRIANA and FABIANO, and also on the street. Several cellular phones utilized by the group were registered in his name, including the cellular phone 51.9323.0393, one of the most used by FABIANO, ADRIANO AND CACO in the answering of calls from clients.

LUIZ CARLOS FAGUNDES JUNIOR (JUNIOR), acted on the streets, carrying money, making deliveries, withdrawals and other clandestine financial operations. In the Police Intelligence report there is the deposition of KENETI LASTE DOS SANTOS, done before the police investigation 872/2003, where he said he had worked as an office boy in PORTOCRED, and that the money received was given to JUNIOR, making it clear that the involved in the investigation already had business relations at that time.

Also ELENICE MESQUITA RIMOLO, JUNIOR's wife, was partner of the company ZALEX VIAGENS E TURISMO E CAMBIO LTDA (CNPJ 92.663.863/0001-67), together with PATRICIA IZE KLEIN, JOAO BATISTA URRUTIA JUNG and EDSON MANENTI, a shell corporation used for black market exchange and factoring.

Intercepted audios between LUIZ CARLOS FAGUNDES JUNIOR and other speakers, demonstrating his involvement with the organization, can be accessed in the Police Intelligence Report.

JEFFERSON PEREIRA (CAPU), would carry and deliver money and documents for the organization. Below is an intercepted audio between ANA PAULA IZE KLEIN and JEFFERSON PEREIRA DA SILVA – CAPU, in which it becomes clear that she is coordinating him to help MARCIO in transporting 300, possibly R$ 300,000.00. CAPU states that he has nothing on him, referring to "perneiras", which are utilized for the transporting of money.

| TELEPHONE | NAME TARGETED | |
| 5181492079 | TOUR EXPORT V. E TURISMO LTDA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@PATY X CAPU | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |

| 12/12/2006 17:11:51 | 12/12/2006 17:12:36 | 00:00:45 |

...

SUMMARY
FINANCIAL TRANSACTIONS – MONEY IN SUITCASE, CASH.
DIALOGUE
PITY. asks is he is already buying or not, if he is already at the teller. CAPU says no. PITY says that she needed him to go to the vault, to do the same thing he did yesterday. CAPU says that he has nothing on him. PITY says that it is the same thing he did yesterday and that he will not need to carry anything, that it is for him to go up there, receive and wait, that MARCIO will go there with the suitcase and that he is to accompany him to the car and that's it, and that there should be 300 – 300,000.00 reais or dollars??? – and that if it is sealed it is to remain sealed and that it won't be necessary to count, just leave it sealed.

RICARDO would also carry and deliver money and documents for the organization. He Possibly works as a taxi driver in the airport. Below are intercepted audios between ANA PAULA IZE KLEIN and RICARDO, where it is also made clear his coordination with PITI, for the carrying of money.

| TELEPHONE | NAME TARGETED | |
| 5191660616 | PAULA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@PAULA X RICARDO?????? | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 09/01/2007 14:17:29 | 09/01/2007 14:17:50 | 00:00:21 |

...

DIALOGUE
PAULA asks form him to wait in downtown, because she is checking something with ADRI – ADRIANA SCHUNCK – to free CASSIO to go there, and that then she will let him know. RICARDO says that he is waiting.

| TELEPHONE | NAME TARGETED | |
| 5191660616 | PAULA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| PAULA X RICARDO@@@??? | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 10/01/2007 17:12:54 | 10/01/2007 17:13:19 | 00:00:25 |

...

DIALOGUE
JAIME says that she is arriving in the airport, and that she is going to AK, and asks if MARCIO is going there. PAULA says that he probably has arrived and that she will call him.
COMMENT: when the speakers talk about AK, they may be referring to ABRAM KACMAN, client of the group and moves money around with them.

According to the investigation, the employees considered office boys – assets delivery persons, who do banking chores, deliveries and receive valuables, checks, deposits and withdrawals, money deposits in bank vaults, picking up money with clients –should receive special attention. The Police Intelligence report for the police investigation 872/2003 showed that the employee, at that time, of the company LF, KENESTI LASTE DOS

SANTOS, was the beneficiary for the checks issued by LF, which were debited directly with the bank teller, totaling more than four million reais, in a period of three months. KENETI was an employee of PORTOCRED.

ALFREDO is the husband of ADRIANA and participates in the administration and support of the computer system for financial control of the organization, receiving a wage from the group for the services provided, with knowledge of how the programs, which were used by the organization, worked and the characteristics of activities developed with the support given.

Below are intercepted audios between ALFREDO TIMM DE SOUZA and other speakers, considered important for the investigation, in the period of wiretapping considered by the report.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181346666 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@JOAO X HALF | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 14/11/2006 11:08:43 | 14/11/2006 11:10:14 | 00:02:11 |

...

DIALOGUE
JOAO says that he has the account 830 of month 9 SIL – SILVANE – has an investment and a rescue, speaks about client 1999, value 10,000.00, and that he applied on day 25 of the 9. HALF says it is funny that the 10,000.00 shows up with interest, and says that it must be 2, that it is and investment and that changes everything on the total.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181346666 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| QUIRINO X ALFREDO@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 22/11/2006 14:12:26 | 22/11/2006 14:14:59 | 00:02:33 |

...

SUMMARY
EMPLOYEE and SERVICE PROVIDER – ADRIANA is partner without power de facto
DIALOGUE
H – says he is in Sao Paulo in a hurry, A – asks about the 13. If when they were to receive, and asked to CASSIO and said that it would not be, as your condition changed from employee to service provider, and said that suddenly distributed in the months of the contract, Q – and say that it was routine and go talk to FABIANO and check it out.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181346666 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| QUIRINO X ALF@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 30/11/2006 13:29:49 | 30/11/2006 13:31:34 | 00:01:45 |

...

SUMMARY

NETWORK SYSTEM
DIALOGUE
Q – say that you found in account 866 – and ask how can you adjust and ask to see the
difference and how it is?

They would act in the organization, still according to the police authority, as cells, third
parties that participated as partners or employees with power to command other companies,
utilized by the group, directly or indirectly, for the execution of the illicit financial
businesses practiced.

So, **SILVANE DALA SANTA** (CPF 532.814.540-20), acting precisely in Caxias do Sul,
State of Rio Grande do Sul, with the function of attract clients of her region and illicitly
transfer funds, in Brazilian national currency to foreign currency, in order to be invested in
the organization, as well as clients that wish to remit assets into or out of Brazil in an
irregular way.

SILVANE is the partner of the company called VILA ALDA CONSULTORIA
FINANCEIRA LTDA, which would have been substituted by PIEMONT GLOBAL
CONSULTORIA FINANCEIRA LTDA., and would act through them as using the name of
PORTOCRED to capture clients. As the biggest evidence of their integration with the
organization, the police authority mentions the fact that they posses remote access to the
databank maintained by the group, in which the would do transactions and update the
transactions made with their clients, being also possible for the clients to accompany the
transactions they made through de accounts that are opened for them in the 'institution'.

Several intercepted audios between SILVANE DALA SANTA and other speakers, which
indicates her integration to the organization are in the Police Intelligence Report.

**MARGARETE INES DAMIN** (CPF 328.019.980-87) and **VILMA MARIA DAMIN DE
OLIVEIRA** (CPF 223.612.940-87), also cells in Caxias do Sul, State of Rio Grande do
Sul, are sisters that would work together as officers of TOUR EXPORT, executing the
capture of clients that wish to invest its resources in the organization, as well as clients that
who wished to remit valuables into or out of Brazil in an irregular fashion.

Since they don't have access to the computerized system, the usually make calls in the end
of the afternoons to the central office to inform the transactions they negotiated during the
day or to know the fees to be charged for the transactions that were being negotiated.
Apart from that, their accounts are kept in the computerized system, by which they are able
to play with values that are used in the financial transactions made.

The intercepted audios between MARGARETE INES DAMIN and other speakers,
considered important for the investigation, be it for the quality or because of the content of
the calls, or still because of the dependence of the decisions involving the transactions with
their clients, as well as those that refer to the involvement of VILMA MARIA with the
organization are in the Police Intelligence report.

ROSE (not yet totally identified) and MARIA HELENA REIS DE OLIVEIRA PRUX (CPF 177.334.050-68), employees of the UNIBANCO bank, captured clients in Porto Alegre, State of Rio Grande do Sul, whose contact with the investigated suspects of the criminal organization would usually be made by telephone.

ROSE acted in middling de financial transactions between clients and the group.

MARIA HELENA worked with ROSE in UNIBANCO bank, acting in parallel lines with her official work in the intermediation of financial transactions between clients and the group. Both of them do not have, at least in principle, access to the computerized system of financial controls of the group, but due to the geographical proximity, in Porto Alegre, their transactions and contacts with the individuals of the group are eased. They would mainly have contact with FABIANO. There is a comment that they would be leaving the modified hawala system transactions.

The telephone 51.8427.7640, used by ROSE and MARIA HELENA exclusively to talk to the group, is registered in name of MARCIO VIEIRA TATSCH, one of the money carriers of the group. ROSE would have contacts, still, with FABIANO, ADRIANA, CARLOS (CACO) and LEANDRO, in URUGUAY.

The wiretapping of the calls involving ROSE can be found in the Police Intelligence report.

I transcribe below the dialogues intercepted which demonstrate the integration of the so called cells to the organization:

| TELEPHONE 5181820682 | NAME TARGETED FABIANO GOENS-NUFIN | |
|---|---|---|
| SPEAKERS/COMMENTS @@@MARGARETE X FABIANO | | |
| DATE/INITIAL TIME 28/12/2006 11:43:57 | DATE/FINAL TIME 28/12/2006 11:46:23 | DURATION 00:02:26 |

...

DIALOGUE

FABIANO says that there is no price to montar and that he is unable to montar anything. MARGARETE says that she sent him the normal fee and that he calls her back, she said that if he got something better she would call him and reminded that its best not to push it. FABIANO says that it is best to leave it for Wednesday. MARGARETE says that if anything should happen, she will let him know, and says that she needs to speak to LEANDRO to se if by any chance he extornou and if he knows of that operation that JQ – JOAO QUIRINO – had done, the one he spoke to her about, and that she was lancando on her bank extract, and that she doesn't know if they withdrew because they have not yet given her the SWIFT, and that CAIO, her client, says that it didn't transfer and that hers did and that he would not lie, and that they will have to do another one and that JQ didn't send him the SWIFT and that they will have to do a new remessa if it wasn't done already. FABIANO says that one is not to prender because of that. MARGARETE says that today he is not going to anyway, and that it will be done next week, and says that she has to speak to CASSIO to send him the expenditures of the month to him. FABIANO says that he will tell him to call later. MARGARETE says that that is alright and that if anything regarding to this client happens, she will call him.

---------------------------------------------

COMMENTARY: it is once more made clear that MARGARETE submits the power of decision to FABIANO of the fees charged by his financial transactions, as well as makes clear that the connection of the group with LEANDRO – in Uruguay – which is involved I the money transactions with other countries, also utilizing the remessas between international banks, via the SWIFT certification system.

| | |
|---|---|
| TELEPHONE | NAME TARGETED |
| 5191493897 | ADRIANA R. S. DE SOUZA-NUFIN |
| SPEAKERS/COMMENTS | |
| @@@CACO/FABIANO X SILVANE??? | |

| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
|---|---|---|
| 08/12/2006 12:36:14 | 08/12/2006 11:40:57 | 00:04:43 |

...

DIALOGUE

CACO asks in which fax number he should send it. SILVANE says that it is 30277222, and that if MARIA is not there, she is upstairs having lunch and will soon come down, and says that she was in another telephone speaking to her client and that the client has already closed the deal, because the client got a quotation of 2,30 and that he will no settle for 2,29 to sell at 2,30. CACO says that he is putting FABIANO on the phone. SILVANE says that she wants to check with FABIANO the value he will get for checks. SILVANE says that the client closed the deal there for 2,30, and that the hawala system of 149 – US$ 149,000.00 –, if the can get anything for today in checks or in deposit. FABIANO says that the best would be for Monday, and that he is receiving the checks today, but he does not until what time they will receive it, and that he believes that by 3 o'clock they shall be in his hand. SILVANE says that those of 100, came out of a sale from FACULDADE DA SERRA GAUCHA, and that they will bring a lot of paper from him to pay the guys there, and that the guys here will send it abroad, and that they are already opening accounts with her friend outside to send, and that it will be a very expressive transaction and that she will work all week long. FABIANO states that it will be in and out. SILVANE confirms as says that she is with both operations at hand and that those of the 100, that the guy from the university is the first operation he is doing and that who sought him was the ITAU OPERATOR and SANTANDER FROM ABROAD, who indicated this client and that discovered that he is the owner of one of the universities and that he discovered that the value he has to bring is to pay the other side which is opening the accounts, and that the needed maybe 50,000.00 to by in his account and that he arranged to with him to do it today, but yesterday he tried to talk to him – FABIANO – and that he is waiting the account which JOAO QUIRINO has spoken to him since Wednesday, and that he said that he would see with FABIANO and that he asked MARIA and that they didn't send it, and that yesterday she wasn't able to speak to him. FABIANO says that yesterday was horrible, that he didn't even stop there. SILVANE says that she is with the amount to transfer from him since yesterday, and that she needed support in order not to lose it, because she does not want to look bad in the first attempt, because it will be worth 25, which is the sale value of the university which is twenty-five million, and that he already opened 3 accounts, and that for him to see what he can get for her, and that it would be a deposit in the BANCO SAFRA, that needs to be done for him and that a part he has already loaned there. FABIANO asks her to give him the account and the value that she needs and that he will go after it and when he gets it he will call her and then they will monitor it. SILVANE says that she will only be able to send him it as 13:30 hours. FABIANO says that there is no problem and that he has nothing at the moment and he is already after it, and that her fax is

only calling. SILVANE says that MARIA isn't there and didn't leave it in the automatic, but that she will shortly be there.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5199710191 | VILMA -Caxias-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@ZITTO - Client X Vilma | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 04/12/2006 14:54:10 | 04/12/2006 14:56:28 | 00:02:18 |

...

SUMMARY

Money remittance to Brazil from abroad.

DIALOGUE

VILMA says that she wasn't able to talk to Mr. Humberto, and that he wanted to know the fee charged to bring those 15 – 15,000.00 dollars??? – and that if it is to come into an account, that she gave him the number, its 3%, and that if he wanted to be delivered in an branch and deliver it to him its 3.5%, and that if he wanted to be paid in reais there, to him, it comes in the checking account an that he will only pay the fee for the hawala system. ZITO asks if he goes there and delivers it to the person they tell him to. VILMA says that she has to charge the 3.5%. ZITO says that he will give the amount cash to their guys there and they give him in reais. VILMA says that it is 3.5%. ZITO asks what kind of transaction they would not charge the percentage. VILMA says that it is when it enters through an account, which is not their account – ZITO's –, and that it is one of their accounts – VILMA's – and that they will give him reais. ZITO asks if it is in one of their account there – abroad. VILMA confirms and says that they give him an account, and that thy deposit and when it arrives there they pay him and only charge that fee. ZITO asks her to send him a fax with the account number and everything else. VILMA says that she will not fax it and that she will take it there straight, and because faxes are complicated – she fears an investigation – and asks if he understands. ZITO confirms and asks if there – abroad – he – the depositor – will have a receipt of the deposit. VILMA says that that she doesn't even need, and asks if he will do it tomorrow. ZITO says that HUMBERTO is dealing with the matter. VILMA says that it has to be done right, because they do things back and forth.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5193230393 | RODRIGO KUHN DA SILVA-NUFIN | |
| SPEAKERS/COMMENTS | | |
| @@@MARGARETE X ADRIANA | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 09/01/2007 16:54:20 | 09/01/2007 16:57:56 | 00:03:36 |

...

DIALOGUE

MARGARETE says she sold 4,860.00 in tickets – US4,860.00. ADRIANA says 4,860.00 from FE. MARGARETE says 11,130.00 – US$11,130.00, one PIC application, code 888, R$ 16,000.00, LILICA application, code 892, 2,535.00, and a rescue TINA, code 884, R$ 5,000.00, and asks if FABIANO will be there tomorrow morning. ADRIANA says that she thinks that tomorrow the boys – money transporters – will go and will get. MARGARETE says 80 – 80,000.00 – leave it ready and that there is 50 more and that she arranged with FABIANO that she will get it next week. ADRIANA asks if she can't get 10 or more, because she has to pay 110 to a mule there, and that 10 is no help, and that it can be the 80. MARGARETE says that if she suddenly needs to let her know so she puts it there. ADRIANA says that 80 already helps. MARGARETE says that she will leave everything

separated and that it is for her to send cash – dollars – and that she has the check. ADRIANA says that she has to see because the guy will give her the tickets tomorrow. MARGARETE as for a receipt.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5184277640 | ROSE-NUFIN | |
| SPEAKERS/COMMENTS | | |
| ROSE X CARLOS@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 19/12/2006 11:53:25 | 19/12/2006 11:54:54 | 00:01:30 |

...

DIALOGUE
R – asks for market ratings, WIRE, PAPER (DOLLARS), C – wire for you 20.27 and cash 2.21x2.28, R – ask for the wire TED, C-2.22x2.32.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5193241783 | JOAO QUIRINO-NUFIN | |
| SPEAKERS/COMMENTS | | |
| MARQUES X JOAO QUIRINO@@@??? ADAO OFFICE | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 12/12/2006 11:52:20 | 12/12/2006 11:53:52 | 00:01:32 |

...

SUMMARY
MARQUES works with ADAO
DIALOGUE
HNI asks about how is stands with ELO, and that she wants to apply there. JOAO QUIRINO asks how much she wants. HNI says she will need to convert US$2,000.00 into reais, asks the fee he uses. JOAO says that that it is modified hawala system fee and that it is for him to pass that through FABIANO, and asks when is the one for PACIFIC. HNI asks ADAO when the one for PACIFIC is due. HNI says that ADAO does not have a right date and that it must be this month.

Another clarifying fact is the role of administrator, done by CASSIO JUNG, of the structure, the functioning, and the logistics of the parallel financial system of the group.

**ADAO ANTONIO DOS SANTOS** (CPF 123.622.710-72), **MANOEL LUIZ GUILARDI DE FREITAS** (CPF 238.626.530-72), also know as NECO, and **LUIZ JOSE MARQUES JUNIOR** (CPF 315.993.890-53) integrated a fourth cell of the organization in the capturing of clients, acting in the Novo Hamburgo region, State of Rio Grande do Sul.

ADAO ANTONIO DOS SANTOS, alongside MANOEL GUILARDI DE FREITAS, brother of ALEXANDRE GUILARDI, were partners and responsible for the company MUD DUDES, which would be utilized as a façade for the activities of these investigated, acting as a branch of TOUR EXPORT, capturing investments, performing foreign currency exchange, and administering a list of clients in the system. ADAO worked with MARQUES, probably his employee. The telephone used by ADAO (51) 8139-6879 is registered for the company MUD.

The audios demonstrate his involvement with the organization and can be found in the Police Intelligence report.

LUIZ JOSE MARQUES JUNIOR worked for ADAO ANTONIO DOS SANTOS, executing financial transactions and illegal exchange operations. Besides having access to the central computerized controlling system, doing updates and transactions in it, he also participated actively in the street jobs, carrying money, receiving and making deliveries.

The intercepted calls which make reference to this person can be found in the Police Intelligence report.

**ANDRE FABIAN DE SOUZA** (CPF 682.276.710-04) acted as a fifth cell of the organization, with the function of hiding valuables that were destined to the boss of the organization, ANTONIO CARLOS DE OLIVEIRA HAUSSEN. Working at HESSEY FOMENTO COMERCIAL LTDA., and according to intercepted dialogues, he would be the responsible party, because he dealt with FABIANO and coordinate the receiving of money send by him to HAUSSEN.

The importance of ANDRE to the criminal structure consisted in the fact that he was the person who received the money sent via the modified hawala system of TOUR EXPORT/ ROPE in name of HAUSSEN. Below are telephone calls which connect ANDRE to the group, making it clear, too, the transactions of valuables between the office in which ADRIANA and FABIANO work and the one which ANDRE works. ANDRE was mentioned by ADRIANA in which JOAO QUIRINO says he will send to ANDRE the HAUSSEN's money:

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5181820682 | FABIANO GOENS-NUFIN | |
| SPEAKERS/COMMENTS | | |
| ANDRE?/ HAUSSEN X FABIANO@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 06/12/2006 15:33:11 | 06/12/2006 15:37:04 | 00:03:53 |

...

SUMMARY
DINNER next WEDNESDAY
DIALOGUE
A – says that H will speak with him. H – says to go to Iguatemi to get (?) the requests for refurbishment, and would bring 6, in the afternoon. H – asks if he has any scheduled for tomorrow? F – says that he does. A – says that he will take, and to send someone to send it, and that there will be people going on Friday. F – says he has to make dinner next week. Says that he will set thing up for next Wednesday.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5199627707 | ANDRE-NUFIN | |
| SPEAKERS/COMMENTS | | |
| ADRIANA X ANDRE@@@ | | |
| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
| 19/12/2006 12:04:11 | 19/12/2006 12:04:59 | 00:00:48 |

...

DIALOGUE
AD – says she will cancel the transaction and send it in REAIS, and says she will send 2,70 and she will send the receipt of the other one.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5199627707 | ANDRE-NUFIN | |

SPEAKERS/COMMENTS
@@@FABIANO X ANDRE???

| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
|---|---|---|
| 20/12/2006 10:53:39 | 20/12/2006 10:54:38 | 00:00:59 |

...
SUMMARY
FABIANO is sending money to ANDRE
DIALOGUE
FABIANO asks what they agreed on yesterday. ANDRE says it was 70. FABIANO says he did not recall it. ANDRE asks from when on will he come. FABIANO says until Tuesday he wants to see if it already in his hand and maybe before that, but he does not want to promise anything. ANDRE says that he has inverted with him and that everything is OK now.

| TELEPHONE | NAME TARGETED | |
|---|---|---|
| 5199627707 | ANDRE-NUFIN | |

SPEAKERS/COMMENTS
@@@CARLOS X HAUSSEN/ ANDRE

| DATE/INITIAL TIME | DATE/FINAL TIME | DURATION |
|---|---|---|
| 02/01/2007 15:21:07 | 02/01/2007 15:22:44 | 00:01:37 |

...
DIALOGUE
CARLOS asks for ANDRE. HAUSSEN says he is arriving and asks if he can help. CARLOS says he made a deposit in name of EDNA BRIZOLA, and that he is giving it the name of ARI QUEB, and is calling to know. HAUSSEN says that they will check and that he – ANDRE – is arriving. CARLOS says that the EDNAS's deposit is giving ARI QUEB and that they will check. ANDRE says that he will call the person and ask the name being given. CARLOS says it is ARI PEDRO KERBER. ANDRE says that he is calling.

**ELENICE MESQUITA RIMOLO** (CPF 677.286.000-44), **IGOR NIMO MASLOFF** (CPF 667.716.688-00), **EDSON MANENTI** (CPF 381.707.870-68), **ELPIDIO RODRIGUES HOFFMANN** (CPF 206.756.230-49) and **DANTE LUIZ JUNG** (CPF 029.521.900-97). In the past they were partners of companies which the suspects participate or participated in, having left them due the police investigations. Due to this, the remain in the investigation so as to verify if they only legally left the companies, but de facto continue to head them, especially receiving dividends produced by the illicit activities, as is the case of other individuals of the criminal organization, for example, its boss, ANTONIO CARLOS DE OLIVEIRA HAUSSEN.

ELENICE MESQUITA, wife of LUIZ CARLOS FAGUNDES JUNIOR, was partner of ZALEX VIAGENS E TURISMO E CAMBIO LTDA., alongside PATRICIA IZE KLEIN, JOAO BATISTA URRUTIA JUNG AND EDSON MANENTI. And according to the police investigation 872/2003, ZALEX would be a shell company used in the black market and worked with factoring activities.

IGOR NIMO MASLOFF, of Uruguayan nationality, is associated to a range of companies such as PROMOCRED, CALL-SERVICE, COMPANHIA SECURITIZADORA, PORTO TRADING, GVI and PORTOCRED and, as outlined in the investigation, the use of foreigners in Brazilian companies has always been a licit way for illicit ends of macrocriminality, in which the totaling to the capital of the company, the financial benefit many times is utilized to enter assets and monetary instruments in the country, and as a two handed way to equally make the assets and monetary instruments leave the country too. The ease in withdrawing assets and money from the country is what attracts the use of a foreign partner.

EDSON MANENTI was partner of ZALEX VIAGENS TURISMO E CAMBIO LTDA and JARAY PRESTADORA DE SERVICOS LTDA ME, was used by the group as a shell company, in order to hide the financial operations as well as administering the employees that act in the parallel financial system maintained by the investigated organization.

The intercepted audios between ELPIDIO RODRIGUES HOFFMANN and other speakers, considered important to the investigation, can be found in the Police Investigation report.

**LUIZ CARLOS PEREIRA DA COSTA** (CPF 011.150.650-68), **ANDRE OLIVEIRA SOARES** (CPF 011.150.650-68), **LUIS ANTONIO CARVALHO SILVEIRA** (CPF 133.915.770-53), also known as NENECO, and **EDSON MANENTI** (CPF 381.707.870-68) are partners of companies incorporated by the criminal group, and although the police authority indicates that their involvement is not fully detailed, it bases the need to deepen the investigation in relation to them.

LUIZ CARLOS was founder of PORTOTRADING and PORTOCRED, along with HAUSSEN.

ANDRE OLIVEIRA is responsible partner for the company BRASCOM INCORPORADORA E CONSTRUÇÕES LTDA. As was shown in the investigation, the payments made in Brazil by the clients of the modified hawala system are sometimes made via banks, in name of shell companies, utilizing accounts had in both countries, where it was identified BRASCOM INCORPORADORA E CONSTRUÇAO LIMITADA, as beneficiary of a modified hawala system remittance, in its account in BANRISUL.

The intercepted conversation in 24/07/2006, at 16:11:21, by the GUARDIAO system, between RUI (representative of BOXPRINT) and ADRIANA, in which are mentioned dates, values and deposits to be effected in BRASCOM at BANRISUL, being also referred the depositors and mentioning ADRIANA that bank BOSTON no longer receives deposits, indicates that BRASCOM is being utilized for receiving the assets moved by the investigated group, not being the transaction here treated as a sole operation in name of that company.

LUIS ANTONIO is partner of BRASCOM, alongside ANDRE.

The just cause of the measure in relation to the corporate entities investigated, also from the information obtained by the police authority, comes from the fact that the involved with the criminal organization either are part of or practiced crimes through them, as describe below.

**TOUR EXPORT VIAGENS E TURISMO LTDA**. The partners are FABIANO GOENS and ADRIANA REGINA S. DE SOUZA. CACO (CARLOS WAINBERG), RODRIGO, JR, CAPU (JEFFERSON), ROBERTO, PITI, ANA PAULA, would be the employees directly or indirectly linked to the modified hawala system operations. According to the police authority, ADRIANA would simply be a nominee, because she is an employee and has neither power of decision nor attributes typical of a de facto partner; she is simply a legal partner.

With the wiretapping made, both CACO and ADRIANA, when they pick up the customer calls she usually identifies as being TOUR EXPORT, making it clear that they use the name and structure of that shell company to mask their main activity which is clandestine financial transactions, foreign currency exchange, among other typical activities from financial organizations.

**PORTOTRADING SA**. ANTONIO CARLOS HAUSSEN is the president director of PORTOTRADING, with headquarters in Novo Hamburgo, State of Rio Grande do Sul. It was verified in the investigation that HAUSSEN's leadership in regards to the other individual and corporate suspects, as well as that JOAO BATISTA URRUTIA JUNG is one of the directors of the same company. PORTOTRADING is a company which provides services to the small and middle sized exporter.

**PORTOCRED SA CREDITO FINANCIAMENTO E INVESTIMENTO**. JOSE ALEXANDRE GUILLARDI FREITAS is the administrator of PORTOCRED AS. It is a legally constituted company, which practices legal financial operations (financing and credit). ELPIDIO RODRIGUES HOFFMANN, JOSE AMERICO FAGUNDES MACHADO, SERGIO GREHS, GILBERTO BAVARESCO, IGOR NIMO MASLOFF, LEO ISMAR LEWGOY and JOAO BATIST URRUTIA JUNG.

**CONSULTORIA ROPE ESCRITORIO DE ACESSORIA LTDA**. JOAO QUIRINO MEDEIROS GONÇALVES is administrative partner of the company, with 50% of participation. MANOEL LUIZ GUILLARDI DE FREITAS is also administrative partner. MANOEL is brother of JOSE ALEXANDRE, investigated alongside NECO, that is mentioned and talked about in the dialogues, without doubt member of the criminal organization. In the same address work FABIANO, ADRIANA and CACO, all from TOUR EXPORT.

**YALE INTERNATIONAL TRADING LLC.** Is a company incorporated in the United Sates, specialized in all services related to international commerce. As shareholders ANTONIO CARLOS DE OLIVEIRA HAUSSEN, JOSÉ ALEXANDRE GUILARDI DE FREITAS and JOAO BATISTA URRUTIA JUNG, among others, confirming once more the strong relationship had between the individuals of CABO VERDE OPERATION.

**DAWES INTERNATIONAL.** Company with headquarters in URUGUAY, where LEANDRO and JUAN CHIFFLET work, supporting the office of ADRIANA and FABIANO for the illegal remittance abroad. Possibly the partners of the company are the Brazilian "entrepreneurs", or simply figure as shareholders. According to the investigation, it is a way to dissimulate the true owners responsible for the modified hawala system.

BRASCOM INCORPORAÇÕES E CONSTRUÇÕES LTDA. Company utilized for deposits on behalf of the organization, for the services provided with the modified hawala system. ADRIANA gave the account information of BRASCOM so that the client deposited the fee charged for the money remittance (modified hawala system). ANDRE OLIVEIRA SOARES is the administrative partner, and the company has headquarters next to the MANHATTAN building, where TOUR EXPORT's extra-official office operates.

BRASCOM was identified as beneficiary of modified hawala system operations, in their BANRISUL bank account, CNPJ-072.541.42/0001-24, branch 0032, account No. 068557860-4, client company BOXPRINT.

**A P HAUSSEN INVESTIMENTOS LTDA.** Company in the business of investments, located in Santa Cruz do Sul, State of Rio Grande do Sul. PAULO ROBERTO HAUSSEN SEHN is partner. Possibly utilized for loans and assets applications, like those used by PORTOCRED and TOUR EXPORT.

**ARAUCARIA INVESTIMENTOS LTDA.** JOAO BATISTA URRUTIA JUNG and LUCIANA ANTONINI RIBEIRO are the partners. The investigation has pointed out that apart from their commercial purposes, it is also being used by JUNG and LUCIANA for the division of their personal assets. LUCIANA is currently lives with JUNG. The importance of the fiscal analysis of the company and its partners is in the search for knowledge of which are these assets and who are the true owners. The dialog between CAMILO and JOAO JUNG (telephone 51 81197320, tapped on 27/11/2006, at 12:23:24) demonstrates this commentary.

**CISA CARTOES INTELIGENTES SA.** ALEXANDRE, ELPIDIO and JOSE AMERICO are partners. ELPÍDIO is an attorney for PORTOCRED and knows both PORTOCRED's and GVI's data system, which according to information has much more capacity that PORTOCRED and JOSE AMERICO. There is no knowledge of the true purpose of the company, but it is known that their partners are involved and have knowledge of the transactions that happen between PORTOCRED and the ties of ALEXANDRE with the modified hawala system. CISA, alongside MULTIPLO, PORTOCRED, EDUARDO DORFMANN ARANOVICH, GF PROMOTORA, GVI PROMOTORA, DOMANI, FINANSUL, are all located in the same building as PORTOCRED. Some are even in the same location and others in offices beside them.

**COMPANHIA SECURITIZADORA DE CREDITOS FINANCEIROS GOMES FREITAS.** JOSE ALEXANDRE GUILARDI DE FREITAS, FERNANDO GOMES DE FREITAS, IGOR NIMO MASLOFF, JOSE AMERICO FAGUNDES MACHADO, LEO ISMAR LEWGOY, JULIO CESAR CARVALHO DA FONSECA and JOAO BATISTA URRUTIA JUNG are partners.

**DILIGENTER PARTICIPACOES E REPRESENTACOES SA**. FERNANDO GOMES DE FREITAS, NICHOLAS, ALEXANDRE KLEIN DE FREITAS, SEBASTIAN, and JOSE ALEXANDRE GUILLARDI DE FREITAS are partners. The two aforementioned companies, DILIGENTER and COMPANHIA SECURITIZADORA, are registered in the same address and both are currently active. Their link is the figure of ALEXANDRE as partner of both companies.

**JARAU PRESTADORA DE SERVICOS LTDA.** FABIANO RODRIGUES MAGALHAES is administrative partner and CASSIO ANTONIO URRUTIA JUNG, FABIANO RODRIGUES MAGALHAES, MARCO ANTONIO SANTOS GONCALVES, MARCELO DA SILVA LIMA, EDSON MANENTI and FERNANDA DANIELA RUEBENICH are controling partners.

**HESSEY, FOMENTO COMERCIAL LTDA.** ANTONIO CARLOS DE OLIVEIRA HAUSSEN is responsible for the company.

DANA ADMINISTRACAO E PARTICIPACAO LTDA. DANTE LUIZ JUNG is responsible for the company. ANA MARIA URRUTIA JUNG and JOSE MARIA URRUTIA JUNG are also partners.

CALL-SERVICE COMUNICACAO E MARKETING LTDA. IGOR NIMO MASLOFF is responsible for the company. It provides consulting in entrepreneurial management, except specific technical consultancy. Other controlling partners are JOSE ALEXANDRE GUILARDI DE FREITAS and JOAO BATISTA URRUTIA JUNG.

CONSEX COMPANHIA NOVA SERRANA DE EXPORTAÇÃO. MANOEL LUIZ GUILARDI DE FREITAS is the director. It is in the business of wholesale commerce specialized in other intermediary products not previously specified. JOAO QUIRINO MEDEIROS GONCALVES is also partner.

FINANSUL PRESTADORA DE SERVICOS LTDA. MARCIO RONCONI DE OLIVEIRA is responsible for the company.

GF PROMOTORA DE VENDAS E SERVICOS LTDA. JOSE ALEXANDRE GUILARDI DE FREITAS is responsible for the company.

GVI PROMOTORA DE VENDAS E SERVIÇOS LTDA. MARCIO RONCONI DE OLIVEIRA is responsible for the company.

HAUSSEN ASSESSORIA EM COMERCIO DO EXTERIOR LTDA. ANTONIO CARLOS DE OLIVEIRA HAUSSEN is responsible for the company. It is in the business of consulting in entrepreneurial management, except specific technical consultancy.

JUNG – ASSESSORIA E PARTICIPACOES LTDA. JOAO BATISTA URRUTIA JUNG is responsible for the company. It is in the business of consulting in entrepreneurial management, except specific technical consultancy.

MUD DUDES SERVICOS E REPRESENTACOES LTDA. ADAO ANTONIO DOS SANTOS is responsible for the company. It provides other services to companies not specified previously. MANOEL LUIZ GUILARDI DE FREITAS is also partner to the company.

PIEMONT GLOBAL CONSULTORIA FINANCEIRAS LTDA. SILVANE DALA SANTA is responsible for the company. It provides other auxiliary activities of financial services not previously specified.

ROSADAGUA CALCADOS E BOLSAS LTDA. LUIZ CARLOS PEREIRA DA COSTA is responsible for the company. It provides other services to companies not specified previously. NEIDE MARIA SORTICA is also partner.

In regards to the lifting of **fiscal secrecy**, the <u>adequacy</u> of the request consists in the possibility that the collected data may reveal the assets of the investigated and their economical-financial capacity, so as to confront them with the financial operations which are the object of the investigation. It will also allow the verification or not that they were declared, or had their origin dissimulated by the investigated individuals and companies. The need of the measure comes from the inexistence of another capable way to demonstrate the assets situation of the investigated individuals and companies, and the proportionality stricto sensu, already demonstrated in the prior topic.

The secrecy of the information must be upheld, having the parties restricted access to them, and they may not be used for other purposes other than the investigation. This means that they must be kept under seal (Federal Constitution, article 5th, XXXIII and LV and 93, IX, *in fine*; Criminal Code of Procedures, article 792).

**HEREFORE, I decree the lifting of financial and fiscal secrecy** of the below mentioned persons and companies:

<u>Individuals:</u>

1. Adão Antonio dos Santos
2. Adriana Regina Schunck de Souza
3. Alfredo Timm de Souza
4. Ana Paula Ize Klein
5. André Fabian de Souza
6. André Oliveira Soares
7. Antonio Carlos de Oliveira Haussen
8. Carlos Leandro da Silva
9. Carlos Wainberg
10. Cássio Antonio Urrutia Jung

11. Dante Luiz Jung

12. Edson Manetti

13. Elenice Mesquita Rimolo

14. Elpídio Rodrigues Hoffman

15. Fabiano Goens

16. Fabiano Rodrigues Magalhães

17. Igor Nimo Masloff

18. Jefferson Pereira da Silva

19. João Batista Urrutia Jung

20. João Quirino Medeiros Gonçalves

21. José Alexandre Guilardi de Freitas

22. Juan Carlos Chifflet Delgado

23. Luiz Antonib Carvalho Silveira

24. Luiz Carlos Fagundes Junior

25. Luiz Carlos Pereira da Costa

26. Luiz José Marques Junior

27. Manoel Luiz Guilardi de Freitas

28. Marcio Vieira Tatsch

29. Margarete Inês Damin

30. Maria Helena Reis de Oliveira Prux

31. Ricardo José Schmid

32. Roberto Sampaio Trajano

33. Rodrigo Kuhn da Silva

34. Silvane Dala Santa

35. Vilma Maria Damin de Oliveira

Companies:

1. A P Haussen Investimento Ltda.

2. Araucária Investimento Ltda.

3. Brascom Incorporações e Construções Ltda.

4. Call-Service – Comunicação e Marketing Ltda.

5. Cisa Cartões Inteligentes S/A

6. Companhia Securitizadora de Créditos Financeiro Gomes Freitas

7. Consex Companhia Nova Serrana de Exportação

8. Dawes International

9. Consultoria Rope Escritório de Assessoria Ltda.

10. Dana Administração e Participação Ltda.

11. Diligenter Participações e Representações S/A

12. Finansul Prestadora de Serviços Ltda.

13. GF Promotora de Vendas e Serviços Ltda.

14. GVI Promotora de Vendas e Serviços Ltda.

15. Haussen Assessoria em Comércio do Exterior Ltda.

16. Hessey, Fomento Comercial Ltda.

17. Jarau Prestadora de Serviços Ltda. ME

18. Jung – Assessoria e Participações Ltda.

19. Mud Dudes Serviços e Representações Ltda.

20. Piemont Global Consultoria Financeiras Ltda.

21. Porto Trading S/A

22. Portocred S/A Crédito Financiamento e Investimento

23. Rosadagua – Calçados e Bolsas Ltda.

24. Tour Export Viagens e Turismo Ltda.

25. Yale Trading Corp. LLC

And order:

1. the Internal Revenue Service to send, directly to the police authority, in ten days, in electronic format
   a. copy of the income tax return of the abovementioned tax payers, referring to the calendar-year of 2002 to the present date.
   b. Information about the financial transactions of the individuals and companies aforementioned, according to the CPMF – Provisional Contribution on Financial Transactions, from the period of JANUARY/2002 to date, as well as inform in which banks these transactions were made;
   c. Perform a asset survey and comparative analysis, providing a detailed report about
      i. The compatibility of financial resources transacted (obtained via CPMF) and the income tax returns made by the taxpayers;
      ii. If the assets of the taxpayers did not match in any of the analyzed periods;
      iii. If, according to that information, there is reason to believe that there was illicit enrichment of the taxpayers;
   d. Inform if the abovementioned persons were investigated by the Internal Revenue Service in the period between 2002 to date, and, if tax assessment

notice was filed, inform if it has been tried and, due to this, if there was a definitive tax assessment.

2. to the Central Bank of Brazil – BACEN – to send, directly to the police authority, in ten days, in electronic format, based on information derived from the National Client Register of the National Financial System, information containing the data of the accounts for deposits à vista, deposits in the checking account, long term deposits and other assets, rights and valuables, directly or through their legal representatives and solicitors, that the abovementioned individuals and companies have in national financial institutions.

These measures may be directly requested by the police authority to the mentioned institutions, within the limits of the present decision.

**I partially grant** the request contained in item 3 of the representation, so as to authorize the police authority to request the BACEN the tracing for the identification of all de depositors and beneficiaries of the assets transacted by the abovementioned individuals and companies. The request of all and any document which refer to these individuals and companies, however, must be later *individually* requested by this Court, in order to evaluate the just cause of the measure.

I also decree, for now, the internal and external secrecy, since the result of the measures now determined may produce the need of other measures, including of a provisional measure, whose success may be irremediably frustrated if there is any knowledge of the content of the present proceedings by the investigated or by third parties.

I grant the sharing of the information with the Internal Revenue Service, since the measure may be useful to the investigation.

Dê-se vista to the Federal Prosecution Agency, and after, send the proceedings to the Federal Police in order to continue with the investigations. For this reason, I delay the deadline in ninety days.

Porto Alegre, February, 9th, 2007

**Paulo Mario Canabarro Trois Neto**
**Substitute Federal Judge**

Judicial Branch
FEDERAL JUSTICE
District Court of Rio Grande do Sul
1st Federal Criminal Court and Federal Special Court of Porto Alegre

REQUEST FOR SAFEGUARDING MEASURES No. 2007.71.00.004304-6/RS
REQUESTING AUTHORITY: PUBLIC JUSTICE

ORDER/DECISION

It refers to the investigation about the possible perpetration of crimes provided in the Law No. 7.492/86, articles 16 and 22, sole paragraph (crimes against the national financial system) and in the Law No. 9.613/98, articles 1st, I, VI and VII, and § 2nd, I and II (money laundering).

The Federal police submits request from the United States of America, the Swiss Confederation and the Oriental Republic of Uruguay of the following acts by means of Mutual Legal Assistance Request: a) access to information regarding the estate owned by the defendants, including banking data; b) the restraint of movable, immovable assets and financial assts maintained by the defendants in this country; and c) authorization for the sharing of evidence with foreign authorities (pgs. 5/49).

The Public Prosecution requested the granting of the measures (pgs. 51/59).

Here is the report.

1. Of the Investigation

According to the elements gathered by the Federal police, there is evidence that the individuals under investigation have taken part, in an organized, permanent and stable way, in activities inherent to financial institution – collection of third-party funds and transfers of funds abroad -, outside the limits of the official financial system, with the main purpose of concealing and disguising the origin, location and ownership of assets.

Among these activities is the namely "wire-transfer", operation which consists, in a nutshell, in the transfer of funds among the accounts abroad in foreign currency in compensation for the transfer, deposit or withdrawal of the equivalent in national currency in Brazil. The operation may be carried out either for the transfer of funds out of Brazil or the other way round, guaranteeing in both cases that the international flow and the ownership of the assets are not declared to the Government authorities both in the country of origin and the destination country.

This transaction involves simultaneously an exchange operation – the payment of a determined amount of national currency in exchange for the equivalent in foreign currency, or vice-versa - and an international transfer [remittance] of funds, because the owner of the assets has them available abroad.

FILED 07-318

AUG 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The mechanism of operations of international transfer of assets via "wire-transfer" corresponds in general terms to the namely "*hawala[1] system*", listed in the FATF/GAFI[2] 2004-2005 Money Laundering Typologies Report, and which is sorted out as a typical means used in money laundering operations and described as an alternative system of transferring funds abroad as it operates, completely or partially, out of the conventional banking channels.

In fact, although there is the possibility of using this means to transfer funds of licit origin abroad, the "wire transfer" is a highly likely means to perpetrate money laundering, because it allows that, under the appearance of a domestic transfer of funds, the international transfer operation be concealed from the government control bodies (exchange, financial, etc.), both in the country of origin and the country of destination.

In this case, even though there are not yet elements to determine the origin of the total of funds transacted – for such further investigation about the identified senders and recipients shall certainly be necessary – there is evidence that at least part of these funds may have been originated in the international trafficking of narcotics, in particular the connections, pointed out by the police authority, with Colombia and the Juarez cartel/ Mexico, whose one of the leaders was recently arrested in Brazil[3] .

Also relevant as for the sources which fed/feed the group's financial operation, the fact that CARLOS LEANDRO DA SILVA, FABIANO GOENS, JOÃO BATISTA URRUTIA JUNG, JOSÉ ALEXANDRE GUILLARDI FREITAS and LUIZ CARLOS FAGUNDES JÚNIOR were investigated and indicted in a case involving the perpetration of crimes against the national financial system and tax crimes related to the collecting of funds owned by third parties by the company PORTOCRED, whose financial transaction would in thesis be made through front companies (Police Inquiry – IPL 872/03). Though at the time that investigation was concluded, there was not enough information concerning the accounts maintained by the suspects abroad, comparing today the information on the financial operation at the ISRAEL DISCOUNT BANK with the nature of the operations under investigation at the time, it becomes clear a likely connection between the funds obtained with those crimes and the current funds belonging to the group available abroad.

There is therefore evidence that the funds operated  in an undeclared way and outside the official financial system, concealing and disguising the origin, destination and ownership, are originated, at least partially, in crimes against the national financial system,

---

[1] Hawala means trust in Arabic

[2] Money Laundering & Terrorist Financing Typologies, from the site http://www.fatf-gafi.org/dataoecd/16/8/35003256.pdf

[3] According to the International Connection Report, submitted by the police authority "The MEXICO CONNECTION originates in the fact that the individual connected to the CAPE VERDE OPERATION (previously demonstrated with the great number of phone calls and faxes) ROGÉRIO LUIS GONÇALVES Taxpayer's Identification Registry (CPF) 505.007.089-91, the main articulator of the WIRE TRANSFER in SANTA CATARINA, partner of the MEXICAN ERNESTO PLASCENCIA SAN VICENTE CPF 008.698.559-05 in the company DREAM CAR VEÍCULOS National Corporation Registration Number (CNPJ) 04.623.651/0001-99 in JARAGUÁ DO SUL/SC, arrested on 20/07/2006 in BRAZIL charged with the accusation of leading a money laundering organization, find below some reports which describe the facts about the MEXICAN's arrest and his involvement:…"

in the international trafficking of narcotics and crimes perpetrated by a criminal organization, which characterized in thesis crime of money laundering, set forth in the Law No. 9.613/98, art. 1st I, VI and VII, and § 2nd, I and II[4].

On the other hand, collecting funds from third-parties and the activities related to the exchange are typical activities of a financial institution[5], requiring authorization from the Central Bank for their regular exercise in the territory of the country[6]. The exercise of an activity of this nature without the authorization from the monetary central authority characterizes the crime provided in the article 16 of the Law No. 7.492/86[7].

As for the crime of illicit transfer of funds abroad, I point out that the Brazilian legislation does not forbid the transfer or the maintaining of assets abroad, nor does it require any sort of previous authorization to do so.

It is liable to sanction, however, the transfer and the maintaining of funds abroad, over a established amount, without declaration to the Internal Revenue Service and/or to the Central Bank[8].

---

[4] Art. 1    To conceal or disguise the true nature, origin, location, disposition, movement, or ownership of assets, rights and valuables that result directly or indirectly from the following crimes: I – Illicit trafficking in narcotic substances or similar drugs; (...) VI. Acts against the national financial system; VII. Acts committed by a criminal organization. (...) Sentence: incarceration for a period of 3 (three) to 10 (ten) years and a fine. (...) Paragraph 2 The same penalty also applies to anyone who: I. Through economic or financial activity, makes use of any assets, rights and valuables that he/she knows are derived from the crimes referred to in this article; II Knowingly takes part in any group, association, or Office set up for the principal or secondary purpose of committing crimes referred to in this Law.

[5] Art. 1st A financial institution is for the purpose of this Law a corporate entity of public or private law which has as a main or additional activity, cumulatively or not, the collection, intermediation or investment of third parties' funds (vetoed) in national or foreign currency, or the custody, issuance, distribution, trade, intermediation or administration of securities and exchange. Sole paragraph. It is also considered a financial institution:  I – the legal entity which collects or administers securities, exchange, consortium, capitalization or any kind of savings or funds from third parties; II – the individual who performs any of the activities referred to in this article, even in an random way.

[6] Law No. 4.595/64, article 18: " The financial institutions shall only work in Brazil pursuant to previous authorization from the Central Bank of the Republic of Brazil or a decree by the Executive branch in case it refers to a foreign institution.

[7] The article 16 of the Law No. 7.492/86 reads: "To operate financial institution, including negotiating securities or exchange, without proper authorization, or with authorization obtained by means of false declaration: Sentence: incarceration, from 1 (one) to 4 (four) years and fine.

[8] Art. 22 "Proceed non-authorized exchange transactions in order to promote funds transfer outside the country: Sentence – incarceration for a period of 2 (two) to 6 (six) years and a fine. Sole Paragraph. The same penalty shall apply to whoever proceeds non-authorized funds transfer outside the country or keeps undeclared funds abroad without declaring to the competent federal office.

When the individuals under investigation transferred significant amounts of money abroad, via "wire-transfers", they perpetrate, in thesis, the crime set forth in the Law No. 7.492/86, art. 22, sole paragraph, 1st part.

Moreover, the activity under investigation involves necessarily the maintaining of accounts abroad, used for the transfer-in / transfer-out operations carried out in compensation for the operations carried out in the country.

Thus, the individuals under investigation maintained at least 3 (three) accounts in the United States of America at the ISRAEL DISCOUNT BANK, identified by the police authority based on documents shared by the American authorities in the investigations of the named case "Banestado", whose summary of the relevant information is in the chart below (pg.66):

| ACCOUNT | PERIOD OF THE STATEMENT | AMOUNT OF THE TRANSACTION |
|---|---|---|
| 1) NESLER – 0830071 – João Quirino Medeiros Gonçalves , Fabiano Goens and Carlos Leandro da Silva | 07/12/00 to 07/08/03 | US$ 159,437,249.73 |
| II) KINLON – 0831349 – Antonio Carlos de Oliveira Haussen, Maria Edilia Pinheiro dos Santos Haussen | 24/07/01 to 30/12/03 | US$ 8,407,231.06 |
| III) TENDER – 0826865 – Juan Carlos Chifflet, Luis Carlos Pereira | 03/01/00 to 12/12/01 | US$ 80,012,709.06 |

In addition to not existing a statement as for the existence of these accounts, the huge amounts which were operated through the accounts reinforce the conclusion that the individuals under investigation have been working for some time (at least since 2000) as a typical financial institutions, but outside the official financial system (*underground banking*).

In the wiretappings in course, it was also identified at least two other accounts seemingly used by the group in their international financial transactions, in particular the account maintained in the name of the PIEMONT GLOBAL SA, homonymous with the company controlled by the individual under investigation SILVANA DELLA SANTA, at the LLOYDS TSB BANK PLC, in Switzerland.

Maintaining undeclared funds abroad characterizes the crime set forth in the Law No. 7.492/86, art. 22, sole paragraph, 2nd part.

During the investigation, to a great degree by means of the telephone wiretappings and surveillance led by the Federal Police, they have identified evidence of participation of

the following people: ANTONIO CARLOS DE OLIVEIRA HAUSSEN, JOSÉ ALEXANDRE GUILLARDI FREITAS, JOÃO BATISTA URRUTIA JUNG, FABIANO GOENS, JOÃO QUIRINO MEDEIROS GONÇALVES, CARLOS LEANDRO DA SILVA, CASSION ANTONIO URRUTIA JUNG, JUAN CARLOS CHIFFLET DELGADO, ANA PAULA IZE KLEIN, also known as PITI, ADRIANA REGINA SCHUNK DE SOUZA, CARLOS WAINBERG, LUIZ CARLOS FAGUNDES JÚNIOR, ALFREDO TIMM DE SOUZA, SILVANE DALA SANTA, MARGARTE INES DAMIN, VILMA MARIA DAMIN DE OLIVEIRA, ROSE (most likely ROSECLAIR, still noy fully identified) MARIA HELENA REIS DE OLIVEIRA PRUX, ADÃO ANTÔNIO DOS SANTOS, MANOEL LUIZ GUILARDI DE FREITAS, aka NECO, LUIZ JOSÉ MARQUES JÚNIOR and ANDRÉ FABIAN DE SOUZA.

The evidence gathered concerning the participation of the individuals under investigation was analyzed individually in the decision granted on pgs. 44/47 of the proceedings No. 2006.71.00.00.001991-3, grounds to which I report in order to avoid unnecessary repetition and excessive extension of this process.

The Federal Police also identified an extensive list of companies connected with the group under investigation, and the corresponding connections were also object of examination in the already referred to decision. Among these companies, the following companies for the purposes of Request for Assistance:

a) TOUR EXPORT VIAGENS E TURISMO LTDA., front company for the attraction of customers for exchange operations;
b) PORTOTRADING S/A   and PORTOCRED S/A, companies related, respectively, to the assistance to export and to the financial market, controlled by the apparent leaders of the group under investigation. ANTONIO CARLOS HAUSSEN is the director-president of the PORTOTRADING S/A, and JOÃO BATISTA URRUTIA JUNG appears as one of its directors. The PORTOCRED S/A has JOSÉ ALEXANDRE GUILLARDI as the administrator.
c) YALE INTERNATIONAL TRADING, company headquartered in the United States of America, which according to information from its site www.yaletrading.com is controlled , among others, by the individuals under investigation   ANTONIO CARLOS DE OLIVEIRA HAUSSEN, JOSÉ ALEXANDRE GUILLARDI FREITAS, JOÃO BATISTA URRUTIA JUNG;
d) DAWES INTERNATIONAL, headquartered in Uruguay, where CARLOS LEANDRO DA SILVA and JUAN CHIFLET work;
e) PIEMONT GLOBAL SA, homonymous with the company controlled by the individual under investigation SILVANA DELLA SANTA, in whose name was identified a bank account abroad, more specifically at the LLOYDS TSB BANK PLC, in Switzerland.

According to the United Nations Convention against the Transnational Organized Crime, internalized in the country by means of the Decree No. 5.015 dated 12 March 2004, it is understood as an organized criminal group "*structured group consisting of three or more people, which has existed for some time and acted concertedly with the purpose to*

*commit one or more felonies considered serious or listed in this Convention, intending to obtain direct or indirectly an economic or other material benefit;".*

In addition to meet these requirements, in order for a group to be identified as a typical criminal organization, it is deemed necessary the concurrence of some elements which single out the organized criminality, among which are the following: a) transnational nature; b) high degree of damage to the economic and social order; c) high economic power; d) power to corrupt public officials; e) control over determined territory; f) use of violence and/or strong power of intimidation; g) laundering (blanchement) of assets originated in criminal activities; h) hierarchical and or businesslike structure.

They refer to characteristics which, when present in a criminal group, in an isolated or joint fashion, let one tell the criminal organization apart from a mere gang. As typical examples of this criminality in national scope the following criminal organizations can be mentioned can be mentioned: the PCC (First Command of the Capital) (f,h), drug dealers in the Rio de Janeiro hills (e,f), 'Mensaleiros' (Congressmen who received monthly payments in a vote-for-bribery scheme), among others.

The permanent and stable form that the group's activities have been developed, the businesslike, hierarchical structuring, the transnational nature of the operations and the meaningful amount of funds operated, as seen in the chart above, reveal evidence that they refer to a real criminal organization devoted to the perpetration of crimes against the national financial system and money laundering.

Considering all the evidence which disclose the likely perpetration of crimes against the national financial system (Law No. 7.492/86, arts. 16 and 22, sole paragraph, 1st and 2nd parts) of money laundering; (Law No. 9.613/98, art. 1st V, VI, and VII and § 2nd, I and II), perpetrated under the form of criminal organization (Criminal code, art. 288, combined with Law No. 9.034/95, article 1st and Decree No. 5.015 dated 12 March 2004), I consider that both the request for access to the defendants' information about estate and the restraint [seizure] of assets likely maintained abroad should be granted.

I hereby start analyzing these measures.

## II. Access to information about estate / bank secrecy

The secrecy of the banking information, projection of the constitutional right related to privacy, provided in the Federal Constitution, article 5th, X is not absolute.

It is possible to lift the secrecy for the purpose of criminal investigation, whenever there is, in concrete case, evidence of the perpetration of an illicit act and the measure is deemed necessary and adequate as a means of evidence.

The 1988 Federal Constitution has not subjected the issue concerning the "lift"of bank, tax and general data secrecy to the principle of retention of jurisdiction differently from what has been done with wiretapping, data interception, arrest orders and search and seizure orders (Federal Constitution, art. 5th, XII, LXI, XI).

To this extent, it is important to transcribe the following excerpt of the Ministry Francisco Rezek's vote in the judgment of the court injunction MS No. 21.729-DF [06] dated 05 October 1995, for the accuracy and acumen with which he analyzed the exact limits of the secrecy: *"It looks to me as though, before any other thing, the legal question brought before court in this court injunction does not have constitutional stature. All that is provided in the 1988 charter is rules which give way to the treatment of particular issues by means of complementary legislation. It is thus in this domain and not in the scope of the Federal Constitution that the institute of bank secrecy is enshrined – which has been repeated* ad nauseam *in this country and elsewhere that its nature is not absolute. It is cared for the institute which protects certain domains – nothing transcendental but quite prosaic – of people's and companies' lives against unbound curiosity, somewhat evil of other individuals and always to the exact extent where some form of public interest claims its justified prevalence. "*

Notwithstanding, the jurisprudence of the Federal Supreme Court has established the understanding related to the need for the legal authority for the banking or tax data could be obtained in a valid manner in order to find facts for judicial or administrative proceedings. The most relevant precedent in this case was the decision rendered in the PET-QO/557, in the namely case "Magri", who was a former State Ministry in the Collor administration, suspicious of corruption (1992).

In compared law, there is not, as a general rule, such rigor in the protection of the secrecy, although the disclosure of unauthorized banking and/or tax data may hold the individuals who disclosed the information responsible for it, which includes criminal accountability.

In the United States of America, for instance, obtaining banking information is not subjected to judicial authorization in the strict sense, and the administrative authorities may obtain it directly so long as the procedure provided in the legislation for such purpose is observed (*Right to Financial Privacy Act, 12 US Code §§ 3401-3420*). Before the issuance of this statute, the United States Supreme Court had decided that there was not even protection, under the Federal Constitution of that country, to the banking information secrecy, *United States v. Miller 425 US 435* (1976).

Though the right to secrecy of information is as a general rule object of protection under the legal system, in order to avoid abusive disclosure and to preserve people's privacy, such protection is limited by the need for protection to other assets and valuables guaranteed by the State.

The judge must therefore ponder between the public interest in the criminal investigation and the right to preserve the secrecy in relation to the banking and tax information, considering criteria of need, adjustment and proportionality in order to decide whether, in the concrete case, the measure is legitimate or it consist of arbitrary invasion of privacy.

Another relevant aspect in relation to the limits of the bank secrecy is that the information maintained at the financial institutions reveal important information in relation

to an individual's estate. This causes natural limitation to the possibility to prevent that, in certain circumstances and as long as certain legitimacy assumptions are observed, public bodies and even individuals have access to such information.

Note also that the very expression "lift" does not correspond adequately to the nature and particularly to the effects of this type of measure, since the information obtained will not be available for public disclosure, being its use limited to the scope of the records of the inquiry / criminal proceeding and the specific objectives which legitimized its request.

Finally, I point out that the lift of bank secrecy by means of judicial decision is grounded in the article 1st, § 4th of the Complementary Law No. 105/2001.

### III. Of the Restraint [Seizure] of Assets/ Funds Abroad.

In order to guarantee, in case of criminal conviction, the payment of the fine and the court fees, as well as the forfeiture of assets and/or funds acquired with the proceeds of crime (Criminal Code, art. 91, II, b; Law No. 11.343/06, art. 63), or which have been object of money laundering (Law No. 9.613/98, art. 7th, I), the Code of Criminal procedure, in its Chapter VI, the decree-Law No. 3.240/41, art. 1st and the Law No. 9.613/98, art. 4th set forth the possibility of seizure or confiscation of assets.

In order for this measure to be ordered, it is deemed necessary to prove the existence of the crime and the evidence of the identity of the perpetrators (Code of Criminal Procedure, art. 134).

In this case, as extensively explained in the item I above, this investigation has gathered evidence as for the likely perpetration of crimes against the national financial system (Law No. 7.492/86, arts 16 and 22, sole paragraph, 1st and 2nd parts) and money laundering (Law No. 9.613/98, art. 1st, V, VI and VII and § 2nd, I and II), perpetrated by way of a criminal organization (Criminal Code, art. 288 combined with the Law No. 9.034/95, art. 1st and Decree no. 5.015 dated 12 March 2004), existing therefore a fair cause for the measure to be granted.

Over and above this, according to what has been referred to, it was identified significant transaction of funds in accounts maintained by the individuals under investigation abroad, more particularly at the ISRAEL DISCOUNT BANK, in the United States; these accounts were used, as evidence reveals, in the operation of the underground banking activities and money laundering.

There are at least two other accounts currently in use, which are identified in the wiretappings, making it necessary, in relation to these ones, to obtain further information both in relation to its ownership and the origin of the funds transacted in it.

On the other hand, the measure is considered to be absolutely **necessary** to ensure the inefficiency of a likely conviction at least in reference to the measures which had (or should have) effects on the estate of the suspects. Both the time-lapse needed until the final

decision of the case, and the previous awareness as for the possibility of restraint are circumstances that would allow the individuals under investigation to take steps in order to transfer funds and /or sell assets, therefore frustrating any possibility of recovery of these assets.

Thus far it is important to point out that the freezing of assets is the most effective measure in the combat against the money laundering as it deprives both the criminals and the likely financial agents in charge of the laundering of their funds.

Finally, I register that though we have not yet had access to updated information related to the accounts maintained by the individuals under investigation abroad, it is necessary that it be granted and transmitted Request for Mutual Legal Assistance for the freezing of <u>all</u> of the accounts which may exist in the name of the natural or legal persons already identified during the investigation, under the penalty that the time which is necessary for the proceeding of the request for Mutual Legal Assistance results in inefficiency of the measure.

In this context, either these assets are frozen now or there is a chance that it is frustrated the effectiveness of the measures aimed at the recovery of these assets. There is a conflict between fundamental principles of equal hierarchy, which are, the **juridical security** *versus* the **effectiveness of court protection of rights,** which claims for the fair pondering among the factual and the legal possibilities existing in the concrete case[9].

Under this perspective, it should be added that even after the restraint, the accounts may be cleared as long as the licit character of the funds maintained in them is demonstrated or in case it is not sufficiently proved its connection with the crimes under investigation. When the issue is analyzed the other way round, i.e., in case of dismissal, the situation of the fact originated shall be irreversible, which reinforces the conclusion that the more adequate measure, in this case, is the immediate restraint requested by the police authority.

When observed both the *fumus boni iuris* – consubstantiated in the existence of elements of evidence concerning the existence of the crime and its perpetrators – and also

---

[9] To this sense, Robert Alexy teaches (Teoría de los Derechos Fundamental, Centro de Estudios Constitucional, Madrid, 1993, p.112) that "*los principios son mandatos de optimización con respecto a las posibilidades jurídicas e fácticas. La máxima de la proporcionalidad en sentido estricto, es decir, el mandato de ponderación, se sigue de la relativización con respecto a las posibilidades jurídicas. Si una norma de derecho fundamental con carácter de principio entra en colisión con un principio opuesto, entonces la posibilidad jurídica de la realización de la norma de derecho fundamental depende del principio opuesto. Para llegar a una decisión, es necesaria una ponderación en el sentido de la ley de colisión. Como la aplicación de principios validos, cuando son aplicables, está ordenada y como para la aplicación en el caso de colisión se requiere una ponderación, el carácter de principio de las normas iusfundamentales implica que, cuando entran en colisión con principios opuestos, está ordenada una ponderación. Pero, esto significa que la máxima de la proporcionalidad en sentido estricto es deductible del carácter de principio de las normas de derecho fundamental*". To this sense, the relativization of the fundamental rights is the comclusion deemed necessary, under the penalty that it is made unviable the regulative reality of the fundamental rights per se, which in a peculiar factual/juridical situation, may present opposite senses.

the *periculum in mora* – arising from the risk of waiting for the final decision – it must be ordered the restraint of the assets requested by the Federal Police.

### IV. Of the Decisions:

Before the situation explained:

a) I GRANT, grounded on the article 1st, § 4th of the Complementary Law No. 105/2001, **the lift of bank secrecy of the natural and legal persons enumerated in the list enclosed, and particularly the following accounts:**

### THE UNITED STATES OF AMERICA

- Israel Discount Bank, account No. 0830071 (NESLER), maintained in the name of João Quirino Medeiros Gonçalves, Fabiana Goens and Carlos Leandro da Silva;
- Israel Discount Bank, account No. 0831349 (KINLON), maintained in the name of Antonio Carlos de Oliveira Haussen, Maria Edilia Pinheiro dos Santos Haussen;
- Israel Discount Bank, account No. 0826865 (TENDER), maintained in the name of Juan Carlos Chifflet, Luiz Carlos Pereira;
- Sun Trust Bank, account No. 0002611108069, maintained in the name of LOUIS V. LIMAURO.

### SWISS CONFEDERATION

- Lloyds TSB Bank, account No. 6285052, maintained in the name of PIEMONT GLOBAL SA.

The Federal Police and the Federal Public Prosecution request from the United States of America, Swiss Confederation and the Oriental Republic of Uruguay authorities the following:

1) information regarding all the assets, bank accounts or investments that the people named in the list enclosed maintain or maintained in these countries, identifying their information and the banks where the accounts were opened and the investments made, and also to inform the data described as follows:

1.1) providing information about the owners of the referred to accounts, particularly the data and copy of documents which may lead to his/her identification such as name, address, Taxpayer's Identification Registry (CPF) number (in case he/she is Brazilian), as well as which type of relation the abovementioned people have with the owners of the accounts in case they are not the owners themselves.

- Sun Trust Bank, account No. 0002611108069, maintained in the name of LOUIS V. LIMAURO.

### SWISS CONFEDERATION

- Lloyds TSB Bank, account No. 6285052, maintained in the name PIEMONT GLOBAL SA.

I authorize now the Federal Police and the Federal Public Prosecution to request from the United States of America, Swiss Confederation and the Oriental Republic of Uruguay authorities the necessary measures for the implementation of the order in these countries, particularly in reference to the restraint of bank accounts.

Considering that there is no updated data on the accounts maintained at the ISRAEL DISCOUNT BANK, I authorize the Federal Police, in case the accounts had already been closed, to track down the final balances and request the restraint of the funds originated in them, in case they are maintained in the name of the individuals under investigation.

Finally, I authorize the **sharing** of the information gathered in this investigation with foreign authorities for the purpose of finding facts for the criminal and/or administrative proceedings initiated in these countries for the investigation of the facts. The mutual legal assistance is one of the most relevant tools for the combat against crimes such as money laundering and crimes perpetrated by criminal organizations, included clearly in the treaties negotiated on the subject.

If this is not enough, the measure is the natural result of the reciprocity inherent to the international relations. Thus the measure - which requests from the authorities of the countries of destination for this Request for Assistance that it be obtained evidence and precautionary measures in order to ensure the efficiency of the investigations made in the country – should allow for the access in the same manner to the evidence gathered in Brazil. Register at last that there is no impediment in the national legislation to this kind of measure.

**I order**, in addition, the confidentiality of the proceeding until the measures now rendered be fully executed.

**Enclose** copy of the decision rendered on pages 44/77 of the PCD 2007.71.00.001991-3.

Let the Federal Public Prosecution see the records for its information in relation to this decision and to take the appropriate measures relating to the translation and to the transmission of the corresponding Request for Assistance to the United States of America, Swiss Confederation and the Oriental Republic of Uruguay.

The Requests for Assistance shall be transmitted to the foreign authorities directly through the police authority, since it is observed the necessary care so that it is guaranteed the authenticity and the validity of the evidence.

Inform the police authority in charge by transmitting an authenticated copy of this decision.

Porto Alegre, 21 February 2007

**GUEVERSON ROGÉRIO FARIAS**
Substitute Federal Judge

Judicial Branch
FEDERAL JUSTICE
District Court of Rio Grande do Sul
1st Federal Criminal Court and Federal Special Court of Porto Alegre


REQUEST FOR SAFEGUARDING MEASURES No. 2007.71.00.004304-6/RS
REQUESTING AUTHORITY: PUBLIC JUSTICE


DECISION


It refers to a request for complement, prepared by the Federal Police in order to obtain access to documentation and information in general and the restraint of accounts maintained by the individuals under investigation abroad, which have been identified during the wiretapping carried out.

In the decision on pages 68/84 the individuals under investigation had their bank secrecy lifted for the accounts owned maintained abroad, and it was also ordered the confiscation [restraint/seizure] of the funds in the accounts owing to the evidence of perpetration of the crimes set forth in the Law No. 7.492/86, articles 16 and 22, sole paragraph, 1st and 2nd parts (crimes against the national financial system), in the Law No. 9.613/98, art. 1st, I, VI and VII, and § 2nd, I and II (money laundering, all of which perpetrated by a criminal organization (Criminal Code, article 288 combined with the Law No. 9.034/95, art. 1st and Decree No. 5.015 dated 12 March 2004).

In a dialog on the 29th of August of 2006, at 09h41m09s, recorded in the wiretapping of the telephone number 51 8119-7320, the individuals under investigation JOSE ALEXANDRE GUILHARDI DE FERITAS and JOÃO BATISTA URRUTIA JUNG, while they discuss the possibility of obtaining a loan from an individual so far identified as JOÃO, refer to the availabilities [limits] they would have at financial institutions. URRUTIA mentions that he would have 1,2 million at the BANCO DO BRASIL of which 800 [thousand] were "out there". At the end of this conversation the interlocutors again refer to the expression "out there", in relation to the amounts received from abroad originated from exports, including from the YALE (a company owned by the individuals under investigation headquartered in the USA, see pg. 73) – making it unmistakable that the 800 thousand were assets maintained abroad.

Owing to the lack of more information as for the specific branch where the funds were maintained, it is necessary to grant a measure in relation to the three branches of the BANCO DO BRASIL in the UNITED STATES OF AMERICA – Miami, New York and Washington.

In another conversation, on the 21st of September of 2006, at 16h08m42s, between JOÃO QUIRINO MEDEIROS GONÇALVES and a person identified as GLADIS, JOÃO confirms the information for deposit in a "wire transfer" in the amount of (possibly US$) 90,772.00, in an account maintained at the ABN AMRO BANK of Montevideo/URUGUAY, owned by a company named TREMBLA[E]Y S.A.

FILED

07-318

AUG 1 0 2007

NANCY MAYER WHITTINGTON, C.
U.S. DIST

Considering the facts described and the grounds for the decision on pages 68/84, I extend the lift of bank secrecy and the confiscation [restraint/seizure]:

I)     to the accounts maintained by the natural and legal persons named in the list enclosed to the decision on pgs. 68/84 at any branch of the BANCO DO BRASIL in the UNITED STATES OF AMERICA – Miami, New York and Washington;

II)    the account maintained in the name of the company TREMBLAY S.A. [OR TREMBLEY] at the ABN AMRO BANK of Montevideo / URUGUAY.

Let the police authority know about this decision by means of copy of this decision as the official letter.

Then, transmit the records to the Federal Public Prosecution to be translated and included the accounts referred to above in the Requests of Assistance to be sent to the United States of America and to the Oriental Republic of Uruguay.

Porto Alegre, March 1st 207

**GUEVERSON ROGÉRIO FARIAS**
**Substitute Federal Judge**

**Requesting County:** Brazil

**District:** D. D.C.

**CTS Number:**

---

To be completed by the Assistant Attorney General, Criminal Division,

Re: Certification of Foreign Restraining Order for Domestic Enforcement

---

## ASSISTANT ATTORNEY GENERAL DECISION

Re: Certification of Foreign Restraining Orders from the Federative Republic of Brazil Pursuant to 28 U.S.C. § 2467(b)(2) and (3) in the Matter of Cabo Verde.

**DECISION:**

The March 28, 2007 request by the Federative Republic of Brazil for domestic enforcement of three restraining orders, issued by the District Court of Rio Grande do Sul against two Banco do Brasil accounts of YALE INTERNATIONAL TRADING LLC are hereby CERTIFIED to be in the interest of justice.

Alice S. Fisher

**Assistant Attorney General**

**Criminal Division**

8/07/07

**Date**

**FILED**

AUG 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT